## CASEY v. TOPLIFFE et al.
### No. 6399.

United States Court of Appeals for the District of Columbia.

Argued Oct. 9, 1935.

Decided Nov. 18, 1935.

Ralph A. Ricketts and Rossa F. Downing, both of Washington, D. C., for appellant.

Dion S. Birney and Paul E. Lesh, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

Appellant is the widow of Frank Casey, who died in Washington City September 7, 1932. His last will, admitted to probate December 16, 1932, appointed her executrix of his estate. She qualified the 20th of December, 1932. In her petition for probate, appellant reported the value of the estate as around $30,000, and stated that she had in her possession and claimed as her own bearer securities approximating $200,000 in value which her husband had given to her in his lifetime.

Mr. Casey's will, dated September 9, 1927, provided:

"Item I. In the event that my wife, Nettie C. Casey, and my sister, Theodore Casey Topliffe, or either of them, shall survive me, then and in such event only, my entire estate, real, personal, and mixed, of which I may die seized or in anywise entitled, I give, devise, and bequeath unto the National Metropolitan Bank, of Washington, D. C., as trustee nevertheless upon the following trusts and for the following purposes and none other, to wit:

"(a) To collect, receive, hold and (except as to shares of the capital stock of The Stone Straw Company, a corporation of New Jersey, and shares of the common capital stock of Stoneheart Company, a Delaware corporation, as to which provision is hereinafter made) to invest, reinvest, and change the investments of my said estate or any part thereof in the absolute discretion of my said trustee, the purchaser of any such part thereof being not required to see to the application of the purchase money; as to all shares of the capital stock of said The Stone Straw Company and the common capital stock of said Stoneheart Company which may come into the hands of my said trustee, I direct that my said trustee shall have full power to vote the same at any and all meetings of the stockholders of said company or companies, either in person or by proxy, but that neither the whole nor any part thereof shall be sold, pledged or converted except upon the unanimous consent and approval of my said wife, Nettie C. Casey, Carl Casey, James B. Platt, and Landra B. Platt, or of so many of them as may be then living and competent, the proceeds of any such sale, pledge or conversion to become part of the corpus of the trust estate above created;

"(b) To collect and receive all rents, profits and income as the same shall accrue upon and to my said estate and to pay over the net amount thereof quarterly or oftener to my said wife, Nettie C. Casey, if and as long as she shall continue to survive me, and upon the death of my said wife or if she shall have predeceased me, to pay over said net income to my said sister, Theodore Casey Topliffe, if and as long as she shall survive my said wife, and upon the death of the last survivor as between my said wife and my said sister, I

direct that my said trustee shall pay over and distribute the entire balance of said trust estate then in its hands, in fee simple, to the children then living of the said Landra B. Platt, now of Washington, D. C., and the said James B. Platt, now of Baltimore, Maryland, in equal portions, share and share alike.

"Item II. In the event that both my said wife, Nettie C. Casey, and my said sister, Theodore Casey Topliffe, shall predecease me, then I give, devise and bequeath my entire estate, real, personal and mixed, of which I may die seized or in anywise entitled, to the children of the said Landra B. Platt and James B. Platt, who survive me, in equal portions, share and share alike.

"And I do hereby nominate and appoint my said wife, Nettie C. Casey, to be the executrix of this my last will and testament."

Casey left no children or descendants of children. Mrs. Topliffe, one of the appellees, is his sister, and the Platts, whose children were made residuary legatees under the will, are his first cousins and were his business associates. The sister and cousins were his nearest blood kin. In June, 1933, they filed a petition in the probate court having jurisdiction of the administration, praying that appellant be required to disclose on oath all the securities or personal property of every kind which she claimed had been given her by her husband, and that she be required to return an additional inventory of all such property. The National Metropolitan Bank likewise filed a petition denying appellant's right to the securities, and charged that the same were a part of Casey's estate and should have been inventoried as such.

Appellant answered, insisting on her right to the securities as a gift from her husband on December 31, 1928, expressly ratified and confirmed in June, 1931.

In due time the controversy came on to be heard by the Supreme Court of the District, sitting as a probate court, and by a jury. The issues were the following:

"1. Did Frank Casey, on or about the 31st day of December, 1928, make gift to Nettie C. Casey of moneys and securities belonging to him, and if so, of what?

"2. Did Frank Casey, in or about June, 1931, or at any time between December 31, 1928, and the time of his death, make gift to Nettie C. Casey of moneys and securities then belonging to him, and if so, of what?"

In order to align the parties properly, the court placed the burden of proof on appellant, and at the conclusion of the evidence offered in her behalf, and on the motion of petitioners, granted binding instructions.

There are numerous assignments of error, but in the view we take of the case they reduce themselves into two queries: First, did the trial court err in placing the burden of proof on appellant? Second, is the case as made out by appellant sufficient in law to establish a prima facie gift inter vivos of any of the items in question?

We think the first query is answered by our decision in Myers v. Tschiffely, 64 App.D.C. 17, 73 F.(2d) 657. There we said, in effect, that the burden is upon one who, after the death of the alleged donor, claims money as a gift to show an executed gift by clear and convincing evidence, and also that this rule is especially applicable where a confidential relation existed between the parties.

The answer to the second query involves examination of the evidence. To prevail, appellant must show a clear and unmistakable intention on the part of her husband to make an absolute and irrevocable transfer of the property in question from himself to her, and there must be delivery of the subject-matter of the gift; in other words, the evidence must show that her husband parted not only with possession, but with dominion over and control of the property so delivered. Chambers v. McCreery (C.C.A.4th) 106 F. 364, 368; Rosenwald v. Commissioner (C.C.A.7th) 33 F.(2d) 423, 426. Or, as put by the Supreme Court of Illinois in People v. Csontos, 275 Ill. 402, 406, 114 N.E. 123, 124: "It is essential to such a gift that it be absolute and irrevocable; that the giver part with all present and future dominion over the property given; that the gift go into effect at once and not at some future time; that there be a delivery of the thing given to the donee; and that there be such a change of possession as to put it out of the power of the giver to repossess himself of the thing given."

Keeping in mind this rule, we proceed to examine the evidence.

Mr. and Mrs. Casey were married November 1, 1908. They had no children.

Mrs. Casey (appellant) had a son by a previous marriage. He in turn had a son, Robert Engle, who during the last illness of Mr. Casey became his chauffeur and assisted in looking after him.

On the 9th of September, 1927, Mr. Casey executed a will disposing of his entire estate in trust for his wife for her life, and at her death to his sister, Mrs. Topliffe, for her life, and upon the death of the last survivor as between them to the children of his cousins and business associates, Landra B. Platt and James B. Platt. Mr. Casey suffered a stroke of apoplexy in his home in Washington on the 16th of December, 1928, and was taken to Emergency Hospital two days later. He remained in the hospital until the 8th of July, 1929, when he returned to his home. When he first went to the hospital he was helpless and part of the time delirious, and he remained so for several weeks. Thirteen days after his admission, and while he was still extremely ill, his brother, Carl Casey, who afterwards predeceased him, secured from him a special power of attorney in favor of appellant. The purpose was to enable appellant to pay the household and hospital bills, and it authorized her "to sign my name to checks for the withdrawal of any funds now or hereafter on deposit to my credit with the National Metropolitan Bank of Washington, D. C., and to endorse my name on all checks, drafts, or other negotiable paper, belonging to me or made payable to my order."

Mr. Casey had a second stroke the 25th of May, 1931, and again was taken to the hospital, where he remained until the 8th of June, 1931. He returned home; but two days later again entered the hospital, where he remained until his death on the 7th of September, 1932. During the period from July, 1929, to May, 1931, Mr. Casey took no part in the management of his business or personal affairs. He was regarded and treated by his wife as an invalid, and every effort was made to shield him from all kinds of excitement or exertion. Appellant under the power of attorney to check on his bank balances secured the funds for the personal expenses of the family and paid them out as needed. At the commencement of his illness, Mr. Casey maintained a safe-deposit box in the Park Savings Bank of Washington, and in it he kept his securities. The box was registered in the joint names of Mr. and Mrs.

Casey, and each had a key; but prior to his illness appellant did not actively concern herself with her husband's affairs or investments. She had no securities of her own, and exercised no control of the contents of the box. She had a balance to her personal credit in the same bank, which at the time of Mr. Casey's illness amounted to $344.

After execution by Mr. Casey of the power of attorney (December, 1928), appellant became the active business head of the family until Mr. Casey's death. The trial court found as a fact that she bought, sold, and exchanged bonds through Mr. Hume, a representative of the Guaranty Company of New York and a friend and financial adviser of her husband. The transactions would be conducted sometimes in her own name and sometimes in her husband's; and on occasions when the former method had been adopted, the Guaranty Company would return corrected confirmations reciting that the transaction was with Frank Casey, by Nettie Casey as attorney. Later, and when Mr. Hume had changed his representation to a different brokerage house, appellant dealt with that company, through him, in the purchase and exchange of securities, and these transactions were in her own name. To make the purchases, appellant would draw checks on Mr. Casey's account in the National Metropolitan Bank, signing the checks "Frank Casey by Nettie Casey, attorney."

Sometimes she exchanged bonds and securities belonging to Mr. Casey for other bonds, and these she placed in the safe-deposit box in the Park Savings Bank. She made bank deposits to Mr. Casey's account, and whenever necessary removed securities from the box for sale or exchange. In the course of events she found it necessary to secure a larger bank box, and this she rented in the joint names of herself and her husband, and each had a key. Mr. Casey did not enter either of the safe-deposit boxes from the time of the signing of the power of attorney until his death, although on one occasion he went with appellant to the bank and the box was opened in his presence. The maturing coupons were largely, if not entirely, deposited for collection to the account of appellant in the Park Savings Bank, and she drew on that account in payment of living expenses. Mr. Casey would also indorse his personal checks, and she would deposit these to her own credit and withdraw the same as she needed funds

for current expenses. All of this was done with the knowledge of Mr. Casey, and in all the transactions, either of purchase or exchange or deposit, she consulted him and received his approval.

Obviously, there is nothing in this evidence which will support an absolute and unconditional gift, and there is even less in the fact that Casey made the power of attorney of December, 1928; but appellant relies mainly upon certain evidence given by her grandson and his wife of statements made by Mr. Casey, in support of her claim of ownership. Robert Engle, grandson of appellant, testified to a conversation between him and Mr. and Mrs. Casey some time between the 8th and 10th days of June, 1931, at Mr. Casey's apartment. The conversation as repeated by Robert is explained as growing out of the fact that the Guaranty Company, which had been buying and selling bonds on appellant's order, and as to which they understood she was acting for her husband, had requested a power of attorney from Mr. Casey authorizing her, as his agent, to make these transactions. Appellant gave Mr. Casey the request letter from the broker and the power of attorney sent by it for execution, and asked Mr. Casey to sign it. Robert Engle quotes Mr. Casey as saying: "No. I am not going to sign it. It is not necessary to sign it. The securities are yours (meaning appellant), and there is no reason for me to sign this power of attorney."

A little later and while Mr. Casey was still at home, appellant requested Mr. Hume, the agent of the Guaranty Company, to talk to Mr. Casey about it. Mr. Hume came to the apartment, and Robert Engle testified that he was again present, and that Mr. Casey again used language indicating that the securities were appellant's. Mr. Hume does not corroborate this statement; his recollection being that all that Mr. Casey said was that he would not sign the power of attorney because it was not necessary.

Other evidence on which appellant relies is that given by her grandson's wife, who testified that on one occasion between April and July, 1930, Mr. and Mrs. Casey both went to the Park Savings Bank to detach coupons. Appellant alone went into the bank and when she came out she said she was tired. Whereupon Mr. Casey said, "Nettie, dear, that is too bad; but you know these bonds are yours and it is up to you to take care of them." A Mrs. Gillman, an old friend of the family, testified that prior to Mr. Casey's illness and shortly after he had made his will, in a discussion of his affairs with her, he had said, "My * * * stocks and bonds belong to Nettie (appellant)."

Assuming the accuracy and truthfulness of this evidence, the question arises: Is it sufficient without more to make out a case for appellant under the rule in effect in this jurisdiction? The trial court thought not, and, in a written opinion denying the motion for a new trial, said:

"At no time after the alleged gift did Mrs. Casey have the exclusive possession of the securities. On the contrary, we find that she recognized the rights of her husband some time in June, 1931, when she requested that he give her power of attorney to transact his business with the Guaranty Company of New York, and again in February, 1932, when she changed the boxes to larger ones and had the new boxes registered in the names of Frank Casey and Nettie Casey. Furthermore, she conferred with him with respect to the various investments, and there is no evidence that she acted contrary to his judgment or advice. This was the conduct of an agent, and that is true even though she was permitted frequently to buy, sell and exchange the securities belonging to Mr. Casey in her own name. * * *

"The safety boxes were rented in the joint names of Mr. and Mrs. Casey. Each had a key. This arrangement had continued over a period of years prior to Mr. Casey's death, and was in existence at the time of the alleged gift and continued thereafter. Certainly such an arrangement wrought no change in the dominion Mr. Casey previously had over the securities. * * * So far as the evidence discloses, Mr. Casey retained dominion over these securities precisely as he had control of them for over two years immediately following the execution of the power of attorney on December 31st, 1928 and before the alleged gift was made.

"The will executed by Mr. Casey, and which has been admitted to probate, may be considered very properly in this connection. This will furnishes an index to the wishes, desires and intentions of Mr. Casey. First of all he made ample provision for his wife for as long as she might live. He gave all the income from all the property he owned to her for life. At her

death, he desired that his property should go to his own relatives. * * *"

The facts on which the conclusions of the trial court are based are abundantly proved. Mr. Casey, from the time of the first stroke to the time of his death, was an invalid. It is true that there intervened a period of nearly two years during which he was able to be about and sometimes to be left to himself, but the evidence unmistakably shows that during all of this period he depended upon his wife and looked to her to keep his personal affairs in order. The power of attorney which he executed in her favor two weeks after his first attack obviously was intended to secure the means of running the family household and paying the hospital expenses. It is true Mr. Casey never revoked it and that, acting under it, appellant with his knowledge and approval drew funds not only for the purposes mentioned, but also for investment and reinvestment in the management of his estate; but each check so drawn showed on its face that she acted as attorney for her husband. In her original answer appellant claimed that the gift was made "sometime in the fall of 1929," but this position was later abandoned, and by amended answer appellant claimed the gift was made on the 31st of December, 1928 (the date of the execution of the power of attorney), and was consummated "in or about, to wit, June, 1931."

Counsel now concede that up to the period "between June the eighth and tenth, 1931," appellant's relationship to her husband in the matter in question was that of agent, and this brings us to inquire whether the statements of Mr. Casey in the presence of appellant's grandson and his wife, granting they were made, that the securities were hers, are sufficient to transfer to appellant absolute ownership in the $200,000 or more of bonds. We think not. And we likewise think they were not so understood by either of the parties. For the same day, or the next, after the admissions in the presence of the grandson, appellant, as we have seen, sent for Mr. Hume and sought to have him induce Mr. Casey to execute the power of attorney. Obviously she needed no power of attorney if the securities were her own. Likewise, it appears that subsequently appellant purchased and exchanged through this same broker other bonds not for her own account, but for the account of Mr. Casey. And it is also true that at no time did she take the

bonds or other securities into her exclusive possession, nor does she claim that actual delivery was ever made. The new securities were treated exactly as were all the securities which Mr. Casey's money had bought; that is to say, they were put in the safe deposit box rented after the conversation referred to in their joint names and to which both had keys and both had access. In addition to this, there is no identification by name or location of the securities to which Mr. Casey's alleged statement of gift applied. The particular incident to which the conversation related was the purchase by appellant of $5,000 of city of Minneapolis bonds. The broker wanted the authority in writing of Mr. Casey, as to this and subsequent similar transactions, and it was to confirm these purchases that she urged the signing of the power of attorney. Whether, therefore, it was to these or to other securities then on hand that Mr. Casey referred is wholly left in doubt.

The record shows that a part of the bonds were purchased after the June, 1931, incident, and that in each case they were purchased by check drawn on the funds of Mr. Casey in his name by his wife as attorney. In other words, from the day she received the power of attorney to the day of her husband's death, her activities in connection with the securities were exactly the same.

Again, the evidence fails to show that she in her own right ever returned any securities for taxation or that she filed income tax returns showing payment to her of the interest on them. And again, the evidence on which she relies (the admission of the alleged donor) would apply equally as well to the certificates of stock which Mr. Casey owned, and which were registered in his name, but which she does not claim.

All, or practically all, of Mr. Casey's bearer bonds on hand at the beginning of his illness had been exchanged or sold and the proceeds deposited in the National Metropolitan Bank and checked on by appellant to purchase new securities. Other funds of Mr. Casey had been used for the same purpose. All of this had been done under Mr. Casey's direction. He was a trained business man and knew what was necessary to transfer title to these securities, and we think it would be going very far to say that the casual statements on which appellant relies were intended by him to divest himself of all title and con-

548

trol of his property, and this is particularly true when considered in connection with the fact that all of this time he retained in his will provisions wholly to the contrary.

It is, as we think, impossible to apply these facts to the law and sustain the claim of appellant. The case is in many respects like Chambers v. McCreery, to which we have already referred. There four witnesses testified they had heard the husband say he had given the bonds in his lockbox to his wife for her own use, that he had given her a key to the box so that she could remove them at any time; but in that case, as in this, the husband himself retained a key, and in several instances collected the coupons and used them. Here Mr. Casey did not himself go to the box, but admittedly when the bonds were removed for sale by appellant, after consultation with him and likewise after he had approved, the proceeds were deposited to his credit in the National Metropolitan Bank. This does not indicate a change of ownership. In the Chambers Case, Judge Goff, with whom sat Judge Simonton, two very able judges, held that in the absence of proof of absolute possession of the bonds free from the control of the donor, the declarations of the latter were not sufficient to establish delivery. Here, we think that the declarations of Mr. Casey do not disclose a clear and unmistakable intention on his part to make an absolute gift of substantially his entire fortune, and likewise that the evidence fails to show that at any time prior to his death appellant had possession of the same free from her husband's control.

Affirmed.

MARTIN, C. J., dissenting.