**MENDEZ et al. v. MENDEZ et al.**
**No. 4398.**

United States Court of Appeals
First Circuit.
Sept. 21, 1949.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and HARTIGAN, District Judge.

Herbert S. McConnell, San Juan, Puerto Rico, for appellants.

F. Fernandez Cuyar, San Juan, Puerto Rico (Celestino Iriarte, Jr., and H. Gonzalez Blanes, San Juan, Puerto Rico, on the brief), for appellees.

HARTIGAN, District Judge.

This is an appeal from the District Court of the United States for the District of Puerto Rico from a final judgment entered on August 6, 1948, adjudging that the defendants-appellants pay certain sums of money and turn over certain shares of stock to the plaintiffs-appellees.

The plaintiffs-appellees are Estrella B. Mendez, the widow of the late Tomas Mendez Quinones and their two minor sons, Tomas A. and Carlos A. Mendez. They brought this action in the District Court

against seven defendants-appellants: Miguel, Prudencio, Ana, Delfina, Angelina, Zenobia and William Mendez, who are brothers and sisters of said Tomas Mendez Quinones.

Jurisdiction is based on diversity of citizenship and amount in controversy.

The amended complaint alleges that the widow and two sons are the only heirs of Tomas who died intestate September 21, 1944, in Puerto Rico; that Tomas tried to conceal his assets because of a separation proceeding then pending between the spouses by creating a corporation under the name of "Royal Bed & Spring Co. Inc." to which Tomas transferred all the equipment and assets he used in his personal business of making and selling beds; that the stock in the corporation was fraudulently issued as follows: 40 shares to Diago, 40 shares to Colon and 5 shares to Ortiz; that the purpose of Tomas in creating said corporation was to defraud his wife and children of their lawful participation in his estate by distributing his assets among his brothers and sisters through their instigation and connivance; and that as a result thereof, Tomas made a false and simulated transfer of his business properties to the corporation wherein no consideration was paid to him by the corporation and the stock placed in the names of Diago, Colon and Ortiz was never intended to be paid nor was ever paid for by them, who, in fact, retained title to said stock nominally and held it in trust for Tomas and subject at all times to his directions and instructions, he having the real title and beneficial interest in the stock; that upon Tomas' death these nominal holders transferred their stock to defendants without consideration and the defendants now hold the stock to the damage of the plaintiffs who are the lawful owners thereof; that Tomas had deposited $445,000 in a safe, and a few days before his death the defendants broke open the safe in the absence of the plaintiffs and took possession of the $445,000 converting the same to their own use excepting $69,000 which they delivered to plaintiffs' attorney and that the defendants thereafter refused to account for the balance which they have distributed among themselves; that prior to his death, Tomas delivered $15,000 in cash to defendant Ana Mendez, Vda.de Matta, a sister, to be held by her for Tomas pursuant to the scheme to prevent execution of a judgment obtained by the said wife of Tomas against him, but that after Tomas' death, the defendant Ana converted the $15,000 to her own use by investing it in a particular piece of real estate described in the complaint; that after the death of Tomas, the defendants, Miguel and Prudencio, invested a portion of the money they took from the safe, which belonged to Tomas, in particular pieces of real estate also described in the complaint; that the defendants have fraudulently deprived plaintiffs, as legal heirs of Tomas, of said properties and monies belonging to the estate.

The plaintiffs pray for judgment ordering defendants to account for and deliver to plaintiffs all the assets belonging to the estate of Tomas, including all the stock held in the corporation, all the real estate described in the complaint and all rents collected therefrom and the sum of $445,000, plus interest thereon and dividends received from the corporation and such other relief in the premises as may seem to the court just and equitable.

Answers were filed by Miguel, Prudencio, Ana and William wherein they denied most of plaintiffs' allegations except that they admitted that Prudencio in opening the safe acted on instructions from Tomas and that Prudencio opened the safe while Tomas was alive and took therefrom the sum of $119,304.60 in cash, plus $6,000 in checks of which he later delivered $32,000 to Miguel to hold and invest in trust for the sisters; that Prudencio held $8,000 in trust for Carmen, another sister not a defendant here, to whom he later gave that sum of $8,000, and that he holds $10,000 in trust for the sons of Tomas; and the balance he turned over to the widow of Tomas, and that all this was done on express instructions from Tomas.

I. The trial judge found that Tomas, as part of his scheme to defraud his wife and children of their legitimate property, set up and maintained a certain business in the name of his sister Ana for the purpose

of avoiding compliance with O.P.A. and price fixing regulations; and that although in the name of Ana, the said business was owned solely by Tomas and that the $15,000 delivered by him to Ana over a period of ten months was part of the scheme conducted by Tomas together with Prudencio, Miguel and Ana to defraud the plaintiffs of their legitimate properties. The court ordered Ana to pay to the plaintiffs $15,000 with interest at the rate of 6 per cent from September 21, 1944.

The appellants argue that there is no evidence to support this finding and that Tomas made a gift to Ana of $15,000 *inter vivos* since Tomas under the law was entitled to give away one-third of his estate.

Even admitting that Tomas could have made a gift of $15,000 to Ana, it does not appear that he did so here. His plan was to conceal his assets and he used Ana as a dummy while he retained full control of the business set up in her name. In the circumstances here it is incumbent upon Ana to prove that a gift was intended. Myers v. Tschiffely, 64 App.D.C. 17, 73 F. 2d 657; Casey v. Topliffe, 65 App.D.C. 100, 80 F.2d 543. There is no clear and convincing evidence to sustain a gift.

Ana merely held the $15,000 at Tomas' demand and he never released control over it. She did not intermingle the $15,000 with her own money or accounts nor did she exercise control over it until after Tomas died. In her answer she did not plead that the money was a gift nor does such a claim appear in her testimony. The business was run by Tomas and the testimony discloses that she knew little or nothing about it either before or after his death. It is clear that the business was a sham set up in her name.

The question of whether or not Tomas could have given Ana $15,000 under the law is immaterial since the trial judge found that it belonged to Thomas and not to Ana. In short, the transfer to Ana was colorable.

Apparently, the trial judge disbelieved Ana's testimony that she invested $3,000 in the business and that there was

a return of this $3,000 investment plus $12,000 profit. This action was tried without a jury and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. In Malloy v. New York Life Ins. Co., 1 Cir., 103 F.2d 439, 443, 444; certiorari denied New York Life Ins. Co. v. Malloy, 308 U.S. 572, 60 S.Ct. 86, 84 L.Ed. 480, we said:

"And where the credibility of witnesses is a determinative factor in arriving at findings of fact, as was the case here, the reviewing court will not usually upset those findings made by the judge who has had the opportunity of seeing and hearing the witnesses testify. Moore v. Ford Motor Co., 2 Cir., 43 F.2d 685; Fuller et al. v. Reed et al., 1 Cir., 249 F. 158.

"In the instant case, after a complete review of the evidence, we cannot find any warrant for reaching a conclusion that the lower court was wrong in its findings of fact." See also Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

The business was begun purportedly in 1942 when Ana said she gave Tomas $3,000 to invest in it. It began to show profits about March, 1943 and large payments of from $1,000 to $1,500 per month were made to Ana by Tomas during a ten months period. In March, 1943 the widow brought her separation suit in New York. The coincidence of dates, Tomas' statement to Ortiz as to the need of protecting himself, his secretive maneuvers and his efforts in other ways to conceal his assets during the period from the time of the separation proceeding to the time of his death, such as his keeping large sums of cash in his safe, his keeping a second set of books, his maintaining a safe deposit box in Prudencio's name, his setting up a close corporation and writing up false corporation records and his simulated sales to the corporation indicate a definite scheme to keep his assets from the reach of court process while still exercising complete control of them.

We find nothing in the record to warrant our setting aside, as clearly erroneous, the finding of the trial judge in regard to this $15,000.

II. The trial judge found that Tomas, in order to conceal his estate, due to the separation proceedings then pending between his wife and him, fraudulently and illegally created a corporation to which he transferred all his personal business assets; that the stock was fraudulently issued as follows: Diago, 40 shares; Colon, 40 shares and Ortiz, 5 shares. Further, the judge found that the said stock was not paid for by Diago or Colon; that the shares were never considered as having been owned by the heirs of Diago and that this was part of Tomas' scheme to defraud is wife and children of their lawful properties. Judgment was entered against William Mendez ordering him to deliver to the plaintiffs the 40 shares which he obtained from Diago's heirs, together with $2,000 in dividends paid thereon.

Appellants argue that there is no evidence to support a finding that Tomas retained any beneficial interest or ownership in the 40 shares originally issued to Diago and now held by William.

It appears from the testimony that none of the shares were ever issued until after Tomas' death. Tomas caused false minutes of corporation meetings to be made and there were no directors' meetings until after his death.

The manner of payment for all the shares of stock deserves close scrutiny. Ortiz, Tomas' clerk, testified that Tomas obtained two checks of $4,000 each from Colon and Diago. Colon gave testimony at the trial that he never did actually pay for his 40 shares but that he borrowed the money from Tomas and that he was to repay Tomas out of dividends and such repayment was to be made to Tomas' sisters in case of Tomas' death. Colon, after Tomas' death, transferred the 40 shares to four of Tomas' sisters, defendants here, without consideration. The court found that the transfer to Colon was simulated. The appellants concede in their brief that " * * * the court was perhaps justified in disbelieving the testimony as to the loan and in holding that in fact Colon was a mere dummy and that the 40 Colon shares belonged at all times to Tomas Mendez; and that Colon

acted as a mere instrument for the transmission of the shares to the sisters."

Appellants' argument continues that no such analogous evidence was introduced as to the 40 shares in Diago's name and which were later transferred by Diago's heirs to the defendant, William Mendez. They argue further that it is not a necessary and inescapable inference from the record that Tomas by virtue of some secret agreement with Diago remained the beneficial owner of the 40 shares.

Diago was dead at the time of the trial and could not testify, like Colon did, as to the existence of an agreement between him and Tomas. However, the manner of incorporation, the events leading up to its formation and subsequent thereto, especially the devices used by Tomas to assign the shares, were indicative of a definite plan to allow Tomas to retain complete control and ownership. Ortiz, Tomas' clerk, testified that he "paid" for the shares by means of retroactive and prospective salary increases. Colon "paid" for the shares by a "loan" from Tomas to him. The only other one who was to get shares was Diago. The inference is very strong to support the finding that Diago's 40 shares, like Colon's 40 shares, were not paid for by Diago nor by William.

Subsequent to this allocation of 40 shares to Diago by Tomas various facts emerged which negative the position Diago was the owner of these shares. After Diago's death, his heirs in listing his property on a sworn inheritance tax return failed to list these 40 shares though various other stocks were listed. Further, the transfer from Diago's heirs to William expressly obligated William by its terms to pay attorney's fees, taxes and other disbursements arising out of the transaction.

William testified he paid $2,000 for the shares but no one witnessed the transaction though two persons signed later as witnesses. The manner in which William says he obtained $2,000 to pay for the shares is of the dubious variety and might well have been disbelieved by the court. William holds these 40 shares in a peculiarly divided manner, namely: 4 certificates

representing 14, 9, 9 and 8 shares. This peculiar division of the 40 Diago shares held by William bears a similarity to the way the 40 Colon shares were divided, 10 each, between the four defendant sisters. William actively participated with Prudencio in the improper distribution of the estate when he sought to keep Tomas' widow from hearing of the fact that any assets were taken from the safe. He worked with Prudencio for the corporation and received a substantial dividend of $2,000 shortly after he acquired the 40 Diago shares. Though late in arriving on the scene in Puerto Rico, he appears to have fitted into the overall plan to distribute the estate in concert with his brothers and sisters.

The evidence is sufficient to sustain the finding of the trial judge relative to these 40 shares now in the name of William and the dividends paid thereon.

III. The trial judge found that Prudencio received $13,260 between March 28, 1944 and June 28, 1948, and that Miguel received $9,060 between August 18, 1945 to the present time as compensation for occupying the posts of treasurer and president, respectively, of the Royal Bed & Spring Co. Inc. Prudencio and Miguel were ordered to pay to the *plaintiffs* the sums so received by them.

Appellants appeal this part of the judgment and argue that it is an "absolute *non sequitur*" on the ground that the compensation, if returnable at all, should go to the corporation and not just to *some* of the shareholders, the plaintiffs, appellees here. Further, they argue that Prudencio and Miguel performed valuable services to the corporation and that there is no showing that the compensation therefor was improper or excessive.

Appellees argue mainly that the corporation was merely "Tomas Mendez in a new dress; he had simply changed his habiliments; all its movements were his; without him it had no life or being." They also argue that the corporation is an instrument of fraud and that the court should ascertain who are the actual and substantial beneficiaries, and that any compensation paid Prudencio and Miguel in furtherance of the fraud should not be retained and the fruits of their fraud should be disgorged and paid to the plaintiffs, appellees.

We do not disparage the principle contained in this last argument by refusing to apply it here. It is a salutary principle where applicable, but it is not controlling in the instant case.

The essence of appellees' argument is that we should disregard the corporate entity, despite the presence of one or two innocent stockholders, and require Prudencio and Miguel to return to the plaintiffs, appellees, all the salary received by them as officers of the corporation.

A number of reasons militate against this argument. The corporation is not a party to this action. The appellants were not on notice that the question of their salaries as officers was at issue. There is a bona fide business here. A corporation to operate must have agents. It appears that Prudencio and Miguel were duly elected as officers and had legitimate functions. There has been no showing that their compensation was excessive or improper. The corporation has made no accusation against them. It is not alleged, nor does testimony show that they had anything to do with the formation of the corporation.

The trial judge recognizes the corporation. He found Colon's 40 shares and Diago's 40 shares (held by William) should be turned over to the appellees. He also found that there are two other bona fide stockholders. The device of incorporation could not of itself defraud the appellees because the property that Tomas formerly owned was not extinguished thereby. Tomas still owned the shares which represent the property he turned over to the corporation. Furthermore, the plaintiffs, appellees have been held to be the owners of 12/13ths of all the shares. The appellee-widow even participated in a stockholders' meeting of the corporation and attended the election of directors and presumably participated in the 50% dividend to stockholders declared on December 11, 1946.

It does not appear that the appellees will be permanently harmed by making the corporation a party in a suit to recover the compensation in question here. Prudencio and Miguel in such suit will be on notice of the issue and the question of whether or not the compensation was improper or excessive can be determined. It is quite possible that if this part of the judgment were allowed to stand, the corporation might still institute an action against Prudencio and Miguel. To avoid such incongruous results and to achieve fairness and to determine the facts as to these salary payments, the corporation should be a party to any such action. City of Davenport v. Dows, 18 Wall. 626, 85 U. S. 626, 21 L.Ed. 938; Philipbar v. Derby, 2 Cir., 85 F.2d 27.

We do not agree with the trial court's ruling that the amounts received by Prudencio and Miguel as salary should be paid by them to the appellees in this action.

IV. The trial judge found that the defendant Prudencio received the sum of $1,125 during the period from October 23, 1944 until February 14, 1945, in the following manner: that during said period of time the corporation issued weekly checks in the sum of $75 in favor of Colon as president. Such checks, after having been issued, were delivered to Colon by the corporation's clerk, Ortiz, endorsed by Colon, and returned to Prudencio. The judgment based on such finding was that Prudencio pay to appellees the sum of $1,125 with interest at the rate of 6 per cent from February 14, 1945.

Prudencio argues that there is no evidence to support this ruling.

The testimony of Colon reveals that he returned the checks to the treasurer of the corporation, Prudencio.

There is no convincing evidence that Prudencio converted these checks to his own use. Even if he did, as in the question of the compensation of Prudencio and Miguel already considered above, it would be the corporation's right to sue. The corporate records should shed some light upon this point, yet the appellees' witness, an accountant who inspected them, was asked no questions relative thereto. A suit by the corporation against Prudencio should elicit whether or not he converted said corporate funds. We do not concur in the trial judge's ruling with reference to said checks in the amount of $1,125.

V. The trial judge found that Prudencio had Tomas' safe forcibly opened a few days before Tomas' death and took therefrom $69,000 which sum Prudencio later delivered to appellees' attorney, and an additional sum of $50,000 which Prudencio fraudulently withheld from the appellees, and "a $6,000 check drawn by the deceased Tomas Mendez Quinones in favor of Vanuffle Tube Corp. and endorsed by said corporation, which check the defendant Prudencio Mendez also fraudulently withheld from the plaintiffs." Thereupon judgment was entered against Prudencio ordering him to pay to the appellees the sum of $6,000 plus interest.

Prudencio argues that there is no evidence to support the finding that there was a check of $6,000 so drawn and endorsed.

In his answer appellant, Prudencio, admits that he took from the safe a certain amount in cash *plus $6,000 in checks.* Appellees admit that Prudencio delivered to them a certain amount of cash plus *$600 in checks.*

Prudencio argues that though he is bound by his admission that there were $6,000 in checks, he is entitled to a $600 credit for the $600 in checks admittedly received by appellees.

The state of the record on this point is not completely clear. However, there is evidence that such a check did exist. The testimony of the corporation's clerk, Ortiz, was that he saw it on Tomas' desk before his death. He also testified that it was certified. The attorney for the widow testified them a certain amount of cash plus *$600 in* Prudencio. The widow also denied receipt of any check in the amount of $6,000. Such a substantial amount is not likely to have escaped the attention of the parties. The trial judge apparently believed the testimony of the widow and her attorney. Furthermore, Prudencio had almost unlimited control of the office and of the safe. He did not satisfactorily explain the $6,000 check and this coupled with his admission that

$6,000 in checks was taken from the safe and his other conduct at concealment, support the finding of the trial judge that Prudencio fraudulently withheld said $6,000 check from the appellees.

The judgment of the District Court is modified by striking out therefrom numbered paragraphs 5, 6 and 7; and as thus modified the judgment is affirmed.