**UNITED STATES of America,**
**Plaintiff,**

v.

**Felix Benitez REXACH et al.,**
**Defendants.**

**No. C 72–58.**

United States District Court
D. Puerto Rico,
San Juan Division.

July 5, 1960.

Francisco A. Gil, Jr., U. S. Atty., San Juan, P. R., for plaintiff.

Brown, Newsom & Cordova, San Juan, P. R., for defendants.

RUIZ-NAZARIO, District Judge.

This is an action for foreclosure of liens for income taxes assessed and outstanding against the taxpayer Felix Benitez Rexach for the years 1951 to 1956, both inclusive, in the sum of $2,354,478.-48, in which assessed interest, fraud, delinquency and negligence penalties plus accrued interest are included. The other defendants are not involved as taxpayers but were joined as defendants merely because they had the immediate control of certain properties the government sought to reach in satisfaction of its tax claims. The action was brought pursuant to Sections 6321, 6322 and 6323, Internal Revenue Code of 1939 [1], 26 U.S.C. §§ 6321–6323. Sections 7401, 7402(a) and 7403, Internal Revenue Code of 1954, 26 U.S.C. §§ 7401, 7402(a), 7403 and 28 U.S.Code § 1345, and was initiated under the sanction and direction of the Attorney General of the United States.

Felix Benitez Rexach was born in Puerto Rico on March 27, 1886, becoming an American citizen under the provisions of the Act of March 2, 1917, commonly known as the Puerto Rico Organic Act of 1917, 48 U.S.C.A. § 731 et seq. He continued to be an American citizen during all of the tax years involved in this case. However, on July 14, 1958, he was denaturalized by the State Department under Section 349(a) of the Immigration and Naturalization Act, 66 Stat. 163, 8 U.S.C.A. § 1481(a).

The taxpayer resided in Puerto Rico until 1934 when he went to Santo Domingo where he undertook harbor construction for the Dominican government. He and his wife established a residence in the Dominican Republic where they continued to reside until 1940, when they returned to Puerto Rico, remaining here as residents until 1944, when they returned to the Dominican Republic. Since that year the taxpayer has been, and now is, a resident of the Dominican Republic and has been and now is domiciled there.

The taxpayer and his present wife Lucienne D'Hotelle Benitez, a native of France, were married in Puerto Rico in 1927. Mrs. Benitez was naturalized but lost her American citizenship in 1949 by reason of having resided outside of the United States for more than three consecutive years. She has been a naturalized citizen of the Dominican Republic since 1949. The taxpayer and his wife have never been legally separated or divorced. The marriage ceremony between the taxpayer and his wife was performed in Puerto Rico by the proper Puerto Rican authority and not by any foreign consul, diplomatic or other foreign agent, and the first matrimonial domicile of the taxpayer and his wife was in Puerto Rico. Since 1944 the matrimonial domicile has uninterruptedly been in the Dominican Republic. The taxpayer and his wife never signed any antenuptial contracts or articles either at the time of their marriage or prior or subsequent thereto relative to their property, either under the laws of Puerto Rico or the Dominican Republic.

The Escambron Development Company is a corporation legally organized under

1. These are sections of the 1954 Code, not the 1939 Code as referred to in the complaint. The equivalent sections of the 1939 Code are numbers 3670, 3671 and 3672, 26 U.S.C. §§ 3670–3672.

the laws of Puerto Rico. At all times material herein it owned and operated a hotel known as the Hotel Normandie. Escambron was organized and incorporated prior to 1944 and has been in legal existence without dissolution ever since that date and ever since that date and at the present time is an active Puerto Rican corporation. All of the stock in Escambron, except three qualifying shares, is held in the name of taxpayer either directly or in his wife's name, taxpayer being the real owner of this stock, subject to any community property rights which his wife may have therein. The taxpayer is also the real owner of the three qualifying shares subject to any community property rights of his wife. The taxpayer is also, subject to community property rights of his wife, the owner of a farm in Puerto Rico, legal title of which is held in his name, which situation was true during the years 1951 to 1956, inclusive, and long prior thereto.

During the years 1951 to 1956, inclusive, the taxpayer received from Escambron a salary of $3,000 annually for his services as president of that corporation.

Escambron's principal income was from the operation of the Hotel Normandie and Escambron Beach Hotel, in and near San Juan, Puerto Rico. During its fiscal years ended June 30, 1951, to June 30, 1956, inclusive, Escambron sustained net losses which converted into taxable years for the periods here in controversy produced or resulted in the following net losses each year:

| | |
|---|---|
| 1951 | $ 50,599.90 |
| 1952 | 63,198.77 |
| 1953 | 73,995.29 |
| 1954 | 76,908.09 |
| 1955 | 126,658.09 |
| 1956 | 113,047.74 |

The outstanding stock certificates in Escambron are now held in the names of the following persons:

| Certificate No. | Date of Issue | Issued To | Number of Shares |
|---|---|---|---|
| 1 | February 16, 1940 | Felix Benitez Rexach | 1,998 |
| 2 | February 16, 1940 | Luis Antonio Miranda | 1 |
| 3 | February 16, 1940 | Modesto Bird | 1 |
| 4 | March 31, 1944 | Felix Benitez Rexach and Mme. Lucienne D'Hotelle | 4,900 |
| 5 | January 2, 1943 | Cruz Montes | 1 |

The Escambron Development Company was organized about 1943 after taxpayer discovered that it was impossible, without incorporating, to issue bonds to finish the construction of the Normandie Hotel then in progress. The books of Escambron disclose that it is indebted to the taxpayer for approximately $1,300,000— for advances made to the corporation from time to time. The taxpayer ran the hotel largely from the Dominican Republic, although he made some trips over to Puerto Rico. The hotel lost money for some time, but is now making money. The last of the bonds was paid off about three years ago and the corporate property is now free of liens. It was absolutely necessary to have the business incorporated because of the bond issue; the corporation kept its own books; has a corporate seal; the taxpayer was its president and drew a salary as such. The corporation had a separate accounting system. Stock in the corporation was issued according to legal procedure and bonds were also issued. Suits were brought against the corporation and defended in the corporate name. Escambron filed its own separate tax returns.

The Commissioner made assessments against the taxpayer for income taxes for the years 1951 to 1956, inclusive, including penalties and interest. The details of the assessments are set forth in Exhibit A, attached to the complaint which is the deficiency letter and which discloses the following assessments:

| Year | Tax | Fraud Penalties | Delinquency Penalties | Penalties under Sec. 294(d) Internal Rev.Code of 1939, 26 U.S.C. § 294(d), and Secs. 6654(a) and 6665(a), Int.Rev. Code of 1954, 26 U.S.C. §§ 6654 (a), 6665(a) |
|---|---|---|---|---|
| 1951 | $258,912.96 | $129,456.48 | $64,728.24 | $38,824.80 |
| 1952 | 102,401.82 | 51,200.91 | 25,600.46 | 15,348.12 |
| 1953 | 154,307.91 | 77,153.96 | 38,576.98 | 23,134.02 |
| 1954 | 290,049.28 | 145,024.64 | ........ | 44,216.04 |
| 1955 | 316,207.88 | 158,103.94 | ........ | 8,850.29 |
| 1956 | 269,884.34 | 134,942.17 | ........ | 7,553.24 |
| Totals | $1,391,764.19 | $695,882.10 | $128,905.68 | $137,926.51 |

The taxpayer filed no income tax returns with the United States Government for any of the years 1951 to 1956, inclusive. He kept insufficient books and records during each of these years and subsequent and prior thereto from which could be adequately determined the amount of his gross income, deductible expenses or net income with respect to the contracts here involved.

The taxpayer's income was computed solely on the proceeds which he received from various contracts entered into between himself and the Dominican Republic. Thus all of the income sought to be taxed was earned in the Dominican Republic. There is no claim respecting any income derived from sources in Puerto Rico or the Continental United States.

The deficiency letter discloses that the net income from 1951 to 1956, inclusive, was computed as follows:

(a) The total gross receipts were first determined according to the contractual provisions, as shown in schedule attached to the deficiency letter.

(b) Net profits on the contracts were determined by treating as profits one-eleventh of the total contract price received.

(c) For the years 1951 to 1953, inclusive, 20% of these net profits was excluded as earned income under Section 116(a), Internal Revenue Code of 1939, 26 U.S.C. § 116(a), and 30% was excluded for the years 1954 to 1956, inclusive, under the provisions of Section 911, Internal Revenue Code of 1954, 26 U.S.C. § 911.

(d) Taxpayer was allowed the standard deduction of $500 and exemptions of $600 each for himself and wife. For the years 1952 to 1956, inclusive, he was allowed a third exemption of $600 as he became 65 years of age in the year 1952.

(e) The balances were treated as taxable income at standard rates and were spread over the years 1951 to 1956, inclusive, by taking the length of time each contract ran before completion according to its provisions and taxing in each year the amount of income proportioned

to the total, which the number of months in that particular year in which the contract was incompleted bore to the total number of months representing the entire life of the particular contract.

(f) Fraud penalties of 50% were added under Section 293(b), Internal Revenue Code of 1939, 26 U.S.C. § 293(b), and 6653(b), Internal Revenue Code of 1954, 26 U.S.C. § 6653(b).

(g) Delinquency penalties of 25% for failure to file returns were also added for the years 1951 to 1953, inclusive, under Section 291, Internal Revenue Code of 1939, 26 U.S.C. § 291, but were not added for the years 1954 to 1956, inclusive, because of the provisions of Section 6653(d), which for those years prohibit the imposition of delinquency penalties if fraud penalties are assessed.

(h) Penalties were assessed under Section 294(d) (1) (A) and (2), Internal Revenue Code of 1939, for the years 1951 to 1954, inclusive, for failure to file estimates of tax liability and for substantial underestimation of tax and under Section 6654(a), Internal Revenue Code of 1954, for the years 1955 and 1956, for failure to pay estimated tax.

It was agreed that the proceeds from a contract dated March 24, 1949, for the dredging of the Port of Ciudad Trujillo, were erroneously included in taxpayer's income for 1951 and 1952. It was stipulated that to the extent that any income from this contract was included in taxpayer's income such inclusion was erroneous since the contract was completed and all payments thereon were made before December 31, 1950.

A contract dated November 10, 1949, No. 7080, calling for the sum of $2,550,-000 covering the construction of Port Barahona was completed before December 31, 1950, and a payment of $975,000 was made in 1950. The following payments were made in 1951:

| January | $575,000 |
| February | $1,000,000 |

By its terms this contract ran for 21 months leaving eight months of its term to be finished in 1951. Thus 8/21 of the

net profits under the formula used by the Commissioner was included in income for 1951 in the sum of $88,311.69.

In the amended complaint, it is alleged that the Commissioner in determining the taxable income omitted two contracts from which the taxpayer received payments from the Dominican Republic, and that there should have been included in taxpayer's income, under a contract calling for the payment of $73,000, the sum of $3,318.37 each in 1953 and 1954, and under a contract calling for the payment of $80,000, the sum of $7,272.73 in the year 1953.

The taxpayer agrees that the allegations in the amended complaint with respect to these two contracts are correct.

For the purpose of determining the net taxable income of taxpayer for the years in question, the percentage of profit and the estimated percentage of completion per year for each contract as determined by the Commissioner in accordance with his assessment are to be applied and no other basis, method, or formula shall here be used. The taxpayer filed income tax returns with the Puerto Rican Government for the years 1951 to 1956, inclusive. In these returns he reported as income only his salary from the Escambron.

Under the amendment to the complaint, an alternative claim is alleged that if the fraud penalties are not allowed for the years 1954 to 1956, inclusive, then the delinquency penalties of 25% should be recovered for those years.

In March 1954, taxpayer was visited at the American Embassy in the Dominican Republic by Revenue Agents Steinberg and Gerson, in connection with a taxpayer's assistance program. Steinberg testified that he discussed with the taxpayer the subject of liability of Puerto Ricans, who were United States citizens but were living outside the United States, for filing income tax returns and told the taxpayer his liability was the same as any other citizen of the United States residing abroad. The revenue agents gave to taxpayer's secretary an "Income Tax Guide for United States Citizens

Abroad" identified as Exhibit A, attached to Steinberg's deposition. The foreword to this Guide calls attention to the fact that it relates to the taxability of American citizens residing out or travelling outside the United States.

According to Steinberg's testimony, taxpayer told the agents he was not subject to the filing of returns because he had not resided in the United States for a number of years. He seemed to be under the impression that the agents did not know what they were talking about.

Taxpayer testified that he did not file returns because he was a Puerto Rican and not a naturalized American and considered the law not applicable to Puerto Ricans.

The taxpayer then wrote to one McDonald, his Washington lawyer, the following letter dated March 23, 1954:

"Dear McDonald:
"Thanks for the documents which I have just received. It will take some time to digest their contents. In the meantime and just to clear out certain doubts—I wish you obtain the services of some person who knows the law in order to obtain a reply to the following:
"(1) The law is applicable to Americans residing in the United States with legal domicile in the United States—that is such American must pay to the United States for Profits made in foreign countries after deducting taxes of country where he obtained the income (Yes or No? Explain).
"(2) On the contrary—An American with home, legal domicile, residence in foreign country for at least 15 years—*with no income at all in the United States*—nor business of any nature in United States—he does have to report to the United States. The question of 'Situs' is paramount. There is no jurisdiction. (Yes or No? Explain).
"(3) What about Puerto Ricans? Puerto Rico has its own income tax law.

"Thanks for a prompt reply. Regards.
"Sincerely,
"/s/ F. Benitez Rexach
"F. Benitez Rexach
"Engineer in Charge
Harbor Works.
"P.S.
"Let me inform you that Edward Brix who was under my employ is now in the States and has left his employ—thru a very dirty act here."

A few days later he received a reply from one Harry Friedman, a lawyer, Munsey Building, Washington, D. C., dated March 29, 1954, which reads as follows:

"Dear Mr. Rexach:
"I refer to your letter dated March 23, 1954, and set forth below the opinions you desire:
"(1) An American citizen residing in the United States is taxed on all income and profits made in foreign countries, to the same extent as if that income were received in the United States. He can deduct, in computing his United States income, the foreign income tax he has paid, or he may apply such foreign income tax as a credit against his United States income taxes. The amount of such credit cannot exceed the same proportion of the tax against which the credit is taken which the taxpayer's net income from sources within such foreign country bears to his entire net income; that is, the foreign tax credit cannot exceed the portion of the United States tax which was paid on that foreign income.
"(2) An American who is a bona fide resident of a foreign country for at least fifteen years, with no income at all in the United States, or any business in the United States, is exempt from United States income taxes on earned income, but not on income from a business or from capital. 'Earned income' means wages, salaries, professional fees and other

amounts received as compensation for personal services. If such a person has no taxable income, he need not file a return but if he has gross taxable income to the extent of $600.00 he must file a tax return, even though he has no tax to pay. If all of his income is exempt, no return need be filed.

"(3) Puerto Rican citizens are not taxable under the United States income tax law. Citizens of the United States who are bona fide residents of Puerto Rico during an entire taxable year are not taxed on income derived from Puerto Rican sources. The income from Puerto Rican sources will be subject to the Puerto Rican income tax. This exemption is not extended to amounts received by a United States Government employee while in Puerto Rico.

"I hope that the foregoing fully answers your three inquiries, but if not, I will be glad to reply to any questions which remain unanswered.

"Very truly yours,
"/s/ Harry Friedman".

The taxpayer denied that the agents advised him that he was required to file returns. He testified that he read the Guide but that it said nothing about liability of Puerto Ricans for tax.

He further testified that he never paid any taxes to the Dominican Republic because of some understanding with unnamed officials in that government and because that government owed him on certain contracts.

The issues now before the Court are succinctly and correctly stated in the Government's brief as follows:

1. Whether taxpayer who was born in Puerto Rico and became a citizen of the United States by virtue of the Organic Act of Puerto Rico of 1917, but who resided in the Dominican Republic became liable during the years 1951 to 1956, inclusive, to file returns and pay taxes to the United States on income received in those years from the Dominican Republic through the employment of capital under contracts for public works between taxpayer and the Dominican Republic.

2. Whether the Commissioner erred in assessing against taxpayer fraud penalties for the years 1951 to 1956, inclusive, under the provisions of Section 293 (b), Internal Revenue Code of 1939, and Section 6653(b), Internal Revenue Code of 1954.

3. Whether the Commissioner erred in assessing against taxpayer delinquency penalties for failure to file returns under Section 291, Internal Revenue Code of 1939, for the years 1951 to 1953, inclusive.

4. Whether the Commissioner erred in assessing against taxpayer penalties for failure to file estimates of income taxes and for substantial underestimation of taxes for the years 1951 to 1956, inclusive, under the provisions of Section 294 (d), Internal Revenue Code of 1939, and Section 6654(a), Internal Revenue Code of 1954.

5. Alternatively, in the event fraud penalties for the years 1954 to 1956, inclusive, were improperly imposed under Section 6653(b), Internal Revenue Code of 1954, should the taxpayer be held liable for delinquency penalties for those years under the provisions of Section 6651(a), Internal Revenue Code of 1954, 26 U.S.C. § 6651(a), in view of the provisions of Section 6653(d), Internal Revenue Code of 1954, which prohibits the assessment of delinquency penalties where fraud penalties are assessed for the same year?

6. Whether, under proper application of accounting methods used by the Commissioner in determining taxpayer's income under contracts with the Dominican Republic, the income of the taxpayer received in 1951 from a certain contract between taxpayer and the Dominican Republic for construction of the Port of Barahona, Dominican Republic, should be excluded from taxpayer's income in full or in part where such contract under its terms was to be completed on or before February, 1952, but was actually completed prior to December 31, 1950.

7. Whether taxpayer should be permitted to deduct from his income in computing his income tax liabilities for 1951 to 1956, inclusive, net losses sustained by Escambron Development Company, a Puerto Rican corporation, in which taxpayer now presently owns all of the stock.

8. Whether the present wife of taxpayer had a vested right of ownership under either the community property laws of the Dominican Republic or Puerto Rico, in one-half of any taxable income which taxpayer received from the Dominican Republic under contracts with that Government.

### I.

■■ Counsel for defendant has produced in this case a very learned, interesting and able argument bottomed on the proposition that there can be no taxation without representation, and that regardless of the correctness of this proposition, the history of Congressional tax policy respecting taxation of citizens who are not represented in the Congress, has always been, and presently is, to exempt them from federal taxation, and that in fact, there is no law extant taxing the income of a Puerto Rican, American citizen by naturalization, earned in a foreign country, in this case Santo Domingo. At the outset, I wish to make it clear that the sole fact of Benitez Rexach's American Citizenship was a sufficient basis for the imposition of the tax by Congress. In the case of Cook v. Tait, 265 U.S. 47, 44 S.Ct. 444, 445, 68 L.Ed. 895, it was said that "the government, by its very nature, benefits the citizen and his property wherever found, and therefore has the power to make the benefit complete. Or, to express it in another way, the basis of the power to tax was not and cannot be made dependent upon the situs of the property in all cases, it being in or out of the United States, nor was not and cannot be made dependant upon the domicile of the citizen, that being in or out of the United States, but upon his relation as citizen to the United States and the relation of the latter to him as citizen. The consequence of the relations is that the native citizen who is

taxed may have domicile, and the property from which his income is derived may have situs, in a foreign country and the tax be legal—the government having power to impose the tax". It is true that Cook was a native born citizen, and is referred to as such in the opinion, but the point made clear in the decision is that *citizens* may be taxed whatever the situs of the property from which the income is derived and whatever may be the domicile of the citizen. Indeed I am unable to find any basis for drawing a general distinction for tax purposes between a native born and a naturalized citizen of the United States. When the latter accepts the protection of the United States, available to all citizens, he simultaneously accepts the same obligations which bind native born citizens. Cook was a resident of, and domiciled in, the City of Mexico.

■■ Thus it seems that citizens are subject to taxation by Congress, whether represented or not. And, coming now to the time honored policy of exempting Puerto Rico from Federal Taxation, whether the geographical unit, Puerto Rico, was excluded from the operation of the internal revenue laws because it has no real representation in Congress in the Constitutional sense or because the Congress merely deemed it more convenient to permit its government to collect its own taxes, the exclusionary clause, § 9 Federal Relations Act, 64 Stat. 319, 48 U.S.C.A. § 734 simply removed Puerto Rico from the operation of Federal tax laws other than those contained in the Philippine Trade Act of 1946, 22 U.S.C.A. § 1251 et seq. this grace extended to the Island of Puerto Rico by Congress has nothing to do with Puerto Ricans who are American citizens and who derive income from sources in foreign countries. Defendant contends, however, that none of the statutes relied upon by the government imposes any tax whatsoever, and quotes them, pointing out their failure to use words that connote an imposition of a tax. The fundamental fallacy of the taxpayer's position becomes evident when the nature of the

Sections is understood and the situations they purport to cover are realized. Indeed, they do not impose any tax. The imposition of the tax is contained in Section 11 [2] of the Internal Revenue Code of 1939, 53 Stat. 5, 26 U.S.C. § 11, which states: "There shall be levied, collected, and paid for each taxable year upon the net income of every individual a normal tax of 4 per centum of the amount of the net income in excess of the credits against net income provided in section 25", and Section 12(b), 26 U.S.C. § 12(b) providing for the levying, collecting and paying of a surtax upon, from and by every individual. Section 116(a)(1) speaks of certain amounts to be excluded from gross income. Section 116(a)(3) defines the term "earned income". Section 251(d), 26 U.S.C. § 251(d) excludes the Virgin Islands from the category of possessions, and states that when that term is used with respect to citizens of the United States, it does not include Puerto Rico. Section 252, as amended by Section 221(b) of the Revenue Act of 1950, reads as follows:

"Citizens of Possessions of United States.

"Any individual who is a citizen of any possession of the United States (but not otherwise a citizen of the United States) and who is not a resident of the United States, shall be subject to taxation under this chapter only as to income derived from sources within the United States, and in such case the tax shall be computed and paid in the same manner and subject to the same conditions as in the case of other persons who are taxable only as to income derived from such sources. This subsection shall have no application in the case of a citizen of Puerto Rico". 26 U.S.C. § 252.

This section, while obviously discriminatory against Puerto Rican American citizens as contrasted with American citizens who are citizens of other possessions, by subjecting Puerto Rican American

citizens to taxes derived from sources outside of the United States, does not purport to levy any tax, nor was it fashioned for that purpose at all. The tax was imposed generally in Sections 11 and 12, and Section 252 simply exempts citizens of possessions from taxation of their income derived from sources from outside the United States, and by exclusion, does not extend its grace to Puerto Ricans.

All of the sections above are merely specific sections modifying the general imposition of an income tax on individuals, and as persons of the circumstances of the defendant are not exempt from taxation on their income from sources outside the United States, the tax being constitutional and in fact imposed, I must hold that as a general proposition, the defendant's income herein involved is subject to payment of the tax.

## II, III, IV and V.

The second question is that of fraud.

The taxpayer, who had no formal engineering training, although recognized as one of the great engineers in connection with harbor works, was, I believe, entitled to presume, in the beginning, that, as a Puerto Rican, he was exempt from the Federal Income Tax. It is a well known fact, running back to the first civil government of Puerto Rico, that Puerto Rico has always enjoyed exemption from the burden of the Internal Revenue laws of the United States. It was not until 1950 that any Puerto Rican paid any Federal income tax; in that year Federal employees in Puerto Rico were brought within its purview. The philosophy of no taxation without representation, while unavailing in this particular case, has been impressed on all Puerto Ricans, both as a part of American Revolutionary history, widely taught here after the departure of the Spanish Crown, and was, to the layman, patent in the Foraker Act, (1902), the Jones or Organic Act (1917) and the Federal Relations Act, 48 U.S.C.A. § 731 et seq. Public argument anent the feasibility of statehood for Puerto

2. Sec. 1, 1954 Int.Rev.Code, 26 U.S.C. § 1.

Rico always has hammered into the consciousness of every literate Puerto Rican that Puerto Rico—the usual frame of reference used being "Puerto Ricans"—was not subject to Federal taxation. Pamphlets, speeches, editorials reiterated this proposition. And from defendant's point of view, during his lifetime in Puerto Rico, from the time he became an American Citizen in 1917, as he had never been subject to any such tax while residing in a territory of the United States, much less would he be subject to it while a resident of and domiciled in, a foreign country, on income coming from its government. It is true that he was visited by two Internal Revenue agents in 1954. He stated his belief that he was not covered by the United States tax; they gave him a pamphlet, which makes no reference to Puerto Ricans abroad nor to the 1950 amendment to Section 252, which was approved after the tax payer was already in the Dominican Republic. It does indeed state that Puerto Rico is a possession of the United States, but defendant already knew that, and that while residing in Puerto Rico he had nevertheless paid no federal tax. Later on he wrote to these agents furnishing information respecting certain of his employees who were American citizens.

However, he consulted his lawyer in Washington who referred the matter to a lawyer and tax expert who informed him that he was not liable for federal taxes. Defendant stated that if he had believed that he was liable he would have formed a Dominican Corporation in connection with his Dominican business.

In view of all the circumstances I cannot hold that Mr. Benitez Rexach was guilty of any fraud in connection with the taxes involved in this case, and I am convinced that the fraud penalties were erroneously assessed against defendant. Moreover, not only has the government failed to show any fraud, the taxpayer's failure to make or file returns within the time prescribed by law was, for the reasons set forth above, due to reasonable cause and was not due to willful neglect. Therefore I must further hold, that the delinquency penalties were improperly assessed, under Section 291, Internal Revenue Code of 1939, Section 6653(b) Internal Revenue Code 1954.

Plaintiff's contention No. 4, that in any event the commissioner was entitled to treat Mr. Benitez Rexach's failure to file a declaration of estimated tax as, or the equivalent of, a declaration estimating his tax to be zero, under § 294(d) (2) of the 1939 Internal Revenue Code, has been withdrawn from this case by the stipulation of December 14, 1959, in view of Commissioner v. Acker, 361 U.S. 87, 80 S.Ct. 144, 147, 4 L.Ed.2d 127, where the Court held that the statute provided no authority for such action in the following language: "The first and primary question that we must decide is whether there is any expressed or necessarily implied provision or language in § 294(d) (2) which authorizes the treatment of a taxpayer's failure to file a declaration of estimated tax as, or the equivalent of, a declaration estimating his tax to be zero."

"We are here concerned with a taxing Act which imposes a penalty. The law is settled that 'penal statutes are to be construed strictly', Federal Communications Comm'n. v. American Broadcasting Co., 347 U.S. 284, 296, 74 S.Ct. 593, 601, 98 L.Ed. 699, and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it', Keppel v. Tiffin Savings Bank, 197 U.S. 356, 362, 25 S.Ct. 443, 445, 49 L.Ed. 790. See, e. g., Tiffany v. National Bank of Missouri, 18 Wall 409, 410, 21 L.Ed. 862; Elliot [Elliott] v. Railroad Co., 99 U.S. 573, 576, 25 L.Ed. 292."

"Viewing § 294(d) (2) in the light of this rule, we fail to find any expressed or necessarily implied provision or language that purports to authorize the treatment of a taxpayer's failure to file a declaration of estimated tax as, or the equivalent of, a declaration estimating his tax to be zero. This section contains no words or language to that effect, and its implications look the other way. By twice mentioning, and predicating its application upon, 'the estimated tax' the

section seems necessarily to contemplate, and to apply only to, cases in which a declaration of 'the estimated tax' has been made and filed. The fact that the section contains no basis or means for the computation of any addition to the tax in a case where no declaration has been filed would seem to settle the point beyond all controversy. If the section had in any appropriate words conveyed the thought expressed by the regulation it would thereby have clearly authorized the Commissioner to treat the taxpayer's failure to file a declaration as the equivalent of a declaration estimating his tax at zero and, hence, as constituting a 'substantial underestimate' of his tax. But the section contains nothing to that effect, and, therefore, to uphold this addition to the tax would be to hold that it may be imposed by regulation, which, of course, the law does not permit. United States v. Calamaro, 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394; Koshland v. Helvering, 298 U.S. 441, 446–447, 56 S. Ct. 767, 769–770, 80 L.Ed. 1268; Manhattan [General Equipment] Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528."

For the reasons stated above, and in respect of questions II, III, IV and V, I must conclude that the defendant is not liable for payment of any of the fraud, delinquency or negligence penalties assessed by the Commissioner.

### VI.

■ The Commissioner determined taxable income from the Barahona contract under the formula conceded to be correct. This contract ran for a period of 21 months and extended through eight months of the year 1951. The Commissioner taxed 8/21 of the proceeds for the year 1951. The taxpayer had no regular accounting method, and the Commissioner treated all of the contracts on the same basis, prorating payments made under them over their life without regard to the dates payments were actually made. The Commissioner without records accurately reflecting income, is given wide discretion as to the proper accounting methods. Okonite Co. v. Commissioner, 3 Cir., 155 F.2d 248, and his methods will not be interfered with unless they are clearly improper. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538.

■ However, although it is true that the formula is correct, and the courts will not ordinarily interfere with the Commissioner's determination in cases where the taxpayer does not keep the proper books, unless the determination is clearly erroneous, the court cannot overlook the fact that the Commissioner in making this jeopardy assessment, made an erroneous assumption that performance of the Barahona contract went on over a period of 21 months which included the first eight months of the year 1951, but the facts show that the contract was fully completed prior to December 1950, and all costs and expenses of performance incurred prior to December 31, 1950. The Commissioner's action throws untaxable 1950 income into 1951, thus making it taxable. It seems clear that the determination was clearly erroneous, and the income from the Barahona Bay contract must be excluded.

### VII.

■ The taxpayer claims that he has the right to deduct in computing his income tax liabilities for 1951 to 1956, inclusive, net losses from Escambron Development Company, in which he presently owns all of the stock. No statute, or section of the Internal Revenue Code involved has been cited in support of the proposition that an individual can deduct the losses of a wholly owned corporation in computing gross income. The corporation in question was organized for a legitimate corporate purpose, kept separate books, and filed its own income tax returns. "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains

a separate taxable entity." Moline Properties v. Commissioner of Internal Revenue, 319 U.S. 436, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499.

## VIII.

Defendant contends that his wife Mrs. Lucienne D'Hotelle Benitez Rexach, had a one half vested interest in his income, which was not, in any event, subject to any tax by the plaintiff. She was during the period involved and now is a Dominican citizen, domiciled in the Dominican Republic, living most of the time in the French Republic. The income the plaintiff is now attempting to tax was derived exclusively from the contracts in the Dominican Republic, and did not at any time have any situs in the United States, the power to tax the same arising solely from the fact that Mr. Benitez Rexach was an American citizen, as discussed in Part I of this Opinion.

If Mrs. Benitez Rexach had a vested interest in her husband's income derived from sources in the Dominican Republic, her interest would not, of course, belong to the American citizen, her husband; and the plaintiff, whose only power to tax derives in this case from the fact of American citizenship, Cook v. Tait, supra, the situs of the property being the Dominican Republic, would be without power to tax that portion of the income which did not, in fact, belong to its citizen.

The rule is that the wife's interest in her husband's income is determined by the law of the domicile where the income is earned, and not the matrimonial domicile. Commissioner of Internal Revenue v. Cavanaugh, 9 Cir., 125 F.2d 366; Blumenthal v. Commissioner of Internal Revenue, 2 Cir., 60 F.2d 715; Shilkret v. Helvering, 78 U.S.App.D.C. 178, 138 F.2d 925. This is the Rule of Conflicts of Law that this court must follow. The plaintiff would have the court refer the issue of the wife's interest to the Conflicts of Laws Rule of the Dominican Republic, and the defendant, on the other hand, interprets our Conflict of Laws rule as referring the issue to the internal substantive law of the Domini-

can Republic for determination of the wife's interest in the husband's income. As propounded in a learned and exhaustive article by Ernst Otto Schreiber, Jr. in 31 Harvard Law Review 523, p. 525, the question is:

"When the conflict-of-laws rule of the forum refers a jural matter to a foreign law for decision, is the reference to the corresponding rule of the conflict of laws of that foreign law, or is the reference to the purely internal rules of law of the foreign system; i. e., to the totality of the foreign law, minus its conflict-of-laws rules?"

The first proposition, which is the one urged by the government would entail the submission of this problem to the conflict of laws rule of the Dominican Republic, which states that the property interests of the spouses are to be determined by the law of the matrimonial domicile (Puerto Rico), and which is immutable, which law would refer the question back to the law of the Dominican Republic, from which it would be referred back here in a *circulus inextricabilus* or endless cycle of reference back and forth, —a species of international lawn tennis, as this renvoi or Weiterverweisung has been called by Buzzati in 18 Annuaire de l'Institut de Droit International, 146.

Fortunately, despite some indication to the contrary in early English cases, for instance In re Johnson (Roberts v. Attorney General) 1903, 1 Ch. 821, the renvoi has never gained a substantial foothold in the Anglo American system of law. As stated by Beale in Conflict of Laws, Vol. I, Sec. 713, p. 55 "The rule of the foreign law adopted by the law of the forum is the rule of succession" (here the rule of community property) "not the Conflict of Laws Rule". The rule the government would apply here is patently a Conflict of Law Rule: reference to matrimonial domicile can only take place where there is a conflict between the internal law of the Dominican Republic and some foreign law, in which case the Dominican Courts follow their Conflict of Law rule, which is to sit and decide the

case as the courts of the matrimonial domicile would do. But the law which here must be found as a *fact*, and applied by this Court, is the internal law of the Dominican Republic as applied there to persons whose matrimonial domicile always has been the Dominican Republic. Our reference therefore, must be governed by the second alternative propounded by Schreiber: "to the purely internal rules of law of the foreign system; i. e., to the totality of the foreign law, minus its conflict of laws rules."

 Applying therefore the rule of the Dominican Republic, the domicile at the time the income was earned, not including the rule of Conflict of Law of the Dominican Republic, Mrs. Benitez Rexach had a one half vested interest equal to the interest of her husband in and to the net income of Mr. Benitez Rexach received during the years involved from the Dominican Republic for the construction and improvement of harbors in the Dominican Republic. See Affidavit of Mr. Herman Cruz Ayala, a Dominican lawyer, defendant's expert on Dominican law.

The government, therefore was without power to tax one half of the income received by defendant in the years involved.

For the reasons stated above in parts 1 to 8, inclusive the court hereby concludes:

1. The defendant Felix Benitez Rexach was liable to file returns and pay taxes on his income received in the Dominican Republic during the years 1951 to 1956 inclusive;

2. All of the fraud, delinquency and negligence penalties assessed against the taxpayer in this case were erroneous;

3. The income received from the Barahona contract must be excluded from any computation of the tax;

4. The taxpayer is not entitled to deduct from his income net losses sustained by the Escambron Development Company during the years involved.

5. The taxpayer's present wife had a vested right of ownership, under the community property law of the Dominican Republic, in one half of any taxable income which the taxpayer received from the Dominican Republic.

The parties are therefore hereby directed to draft and submit proposed findings of fact and conclusions of law, including computations of the amount of taxes due under the holdings of this opinion, for approval by the Court, for which purpose the parties are granted a term of thirty days from the date of this opinion.