**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Felix Benitez REXACH, et al.,
Defendants-Appellees.**

No. 72–1051.

United States Court of Appeals,
First Circuit.

Heard Feb. 8, 1973.

Decided June 27, 1973.

Certiorari Denied Nov. 19, 1973.
See 94 S.Ct. 540.

John J. McCarthy, Atty., Tax Div., Dept. of Justice, with whom Scott P. Crampton, Asst. Atty. Gen., Julio Morales Sanchez, U. S. Atty., Meyer Rothwacks, and Jerome H. Fridkin, Attys., Tax Div., Dept. of Justice, were on brief, for appellant.

Walter L. Newsom, Jr., San Juan, P. R., with whom Rene Benitez, San Juan, P. R., was on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal from a district court judgment upholding, except as to a pittance, a taxpayer's defenses against the United States in a substantial suit for taxes and fraud penalties. The background is picaresque, involving a colorful engineer-entrepreneur (taxpayer) [1]

---

1. This suit was brought against both the engineer and his wife. Pursuant to a prior decision of the district court, United States v. Rexach, 185 F.Supp. 465 (D. P.R.1960), the wife had a vested interest in one-half of his income as provided in Dominican law, and the government thus could only tax the engineer on one-half of his income. The parties stipulated in this suit to abide by that prior ruling and for

whose alleged tax liabilities stemmed from his long-enjoyed preferment, by grace of the late dictator of the Dominican Republic (Trujillo), as chief harbor developer of that country. Some of the alleged earnings from various harbor projects for the years 1959 and 1961 were sought to be taxed. Understandably, the records of complex, now receding events in a land where the old order has long ago yielded to a newer one were less than satisfactory. The trial, only the most recent chapter in a decade and a half of litigation, was an anomalous contest between the national government, armed chiefly with scraps of data and surmises and the aging taxpayer, drawing primarily on his memory. The latter was held to be sufficient to withstand the attack. We reverse and, with much dislike for prolonging the perdurable, remand.

The precise issues all involve, except for one pervasive issue of law relating to burden of proof, their own discrete facts. What needs to be set forth as pertinent background for the entire case is as follows. The taxpayer, whose most recent period of work in the Dominican Republic stretched from 1944 to 1962, first encountered United States tax difficulties in a suit begun in 1958, in which the government laid claim to allegedly unreported income for the years 1951–1956, subsequently expanded in a 1960 suit to encompass income for 1957–1958. Records of taxpayer's costs and equipment purchases in connection with various construction contracts being allegedly non-existent, taxpayer and the government finally agreed to a percentage of completion method of computing profit on officially published contracts. See 26 C.F.R. § 1.451–3(b)(1). One-eleventh of receipts (equivalent to costs plus 10 per cent) estimated on all contracts for a given year was deemed profit. This formula would have resulted in substantial tax obligations during the period 1951–1958, see United States v. Rexach, 185 F.Supp. 465 (D.P.R. 1960), but for a single happenstance. In late May of 1961, the taxpayer paid $1,552,000 in taxes to the Dominican Republic for the years 1951–1958 and claimed a tax credit against his United States tax for those same years. This payment and the foreign tax credits it created, see United States v. Rexach, 200 F.Supp. 494 (D.P.R.1961), enabled taxpayer to reduce his tax liabilities to $78,866.01 plus interest (or $121,132.13) for the years 1951–1956, and to bring about the dismissal of the suit for taxes for 1957–1958.

With the dictator's assassination in late May, 1961, a new chapter began. Not only was taxpayer's existing contract with the Dominican Republic cancelled, but he was sued on past contracts and a sequestrator took possession of all of taxpayer's assets. Taxpayer, who had renounced his United States citizenship in 1958 during the earlier litigation, attempted to regain it, claiming that he had been coerced in his renunciation by Trujillo, who feared that taxpayer's continuing involvement in tax litigation with the United States would reveal taxpayer's kickbacks to Trujillo of $10,000,000 of some $30,000,000 of contracts awarded over the prior 25 years. Taxpayer was ultimately successful in regaining his U. S. citizenship and passport, and filed an amended return for 1958 and returns for 1959–1961.

Internal Revenue personnel, attempting to audit these returns, spent several weeks in the Dominican Republic, saw a limited amount of records, learned of several previously unreported contracts and of the circumstances surrounding the $1,552,000 tax credit previously taken. As to the latter it was found that in 1961 Trujillo had paid taxpayer $1,552,000 allegedly claimed as losses on the Boca Chica project, which was com-

the government to reduce its assessments for the years in question to conform. Although we here use always the total figures for receipts or expenses, our decision is, of course, subject to the uncontested prior ruling and the stipulation. We refer to the engineer throughout this opinion as the taxpayer.

pleted in 1958, and that it was this same sum which taxpayer paid back to Trujillo and took as a tax credit against his earlier United States tax liability. In fact, the entire transaction was solely on paper; no money ever changed hands. These discoveries led to a suit seeking to reopen the cases for the years 1951–1956 and 1957–1958 because of fraud. The government, which at that trial relied only on the undiscovered contracts, once again was unsuccessful, the court finding that the taxpayer's failure to list the contracts was the result of an honest mistake and made in good faith. United States v. Rexach, 41 F.R.D. 180 (D.P.R. 1966). In the meantime, the United States assessed deficiencies, including fraud penalties, against taxpayer of $662,052.62 for 1959 and $2,272,042.95 for 1961, and brought the instant suit in 1964.

The complaint, amended twice, sought taxes on unreported income and penalties for the tax year 1959 stemming largely from two construction contracts, one for a customs house building and the other for facilities at the port of Azua; and for the tax year 1961 from a dredging project on the Yuna River and the $1,552,000 payment on account of the Boca Chica project. A trial in 1966 produced no decision when the trial judge retired. Subsequent skirmishing and a certified appeal led to our decision that taxpayer was liable for taxes during the period of his later-revoked renunciation of citizenship. Rexach v. United States, 390 F.2d 631 (1st Cir.), cert. denied, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968). A second trial took place in 1970 on the earlier record, supplemented by additional evidence governed by a stipulation.[2] The district

court held that the government, having the burden of proof, failed to establish deficiencies in reported income for the customs house, Azua, and Yuna projects; that the 1961 payment for the Boca Chica contract merely offset, as alleged by taxpayer, greater earlier losses on the project; that the taxpayer was entitled to deduct certain additional items for depreciation and theft; and that no fraud on the part of the taxpayer had been proven. United States v. Rexach, 331 F.Supp. 524 (D.P.R.1971).

We shall discuss, in order, the issue of burden of proof, which affects both tax years; the disposition of the major 1959 items—the Azua and customs house projects; the disposition of the major 1961 items—the Boca Chica and Yuna projects; and the remaining issues relating to depreciation, theft loss, and fraud.

## I. Burden of Proof

From what has been already said about the protracted nature of this controversy, the remoteness of events, and the difficulty of access to masses of documentary evidence in the Dominican Republic, it is obvious that a determination as to which party is to bear the burden of proof is of fundamental significance.

The district court stated that "It is elementary that in a suit to collect taxes the Government occupies the status of a private litigant and the burden of proof is upon it." 331 F.Supp. at 538. Although recognizing that the Commissioner's assessment itself establishes a prima facie case, the court believed that only "the burden to go forward", with "competent and relevant evidence from which [it] can be found that he did not receive the income alleged in the defi-

---

2. The stipulation, in essence, provided that the court should consider only the record and the evidence previously adduced at the earlier trial, plus "such relevant testimony [of the government agent] concerning the records of defendant . . . which were recovered from the Dominican Government after the prior trial and which was [sic] made available for inspection

and examination of [the government]" and "such relevant testimony and other evidence as defendant wishes to present with respect to the alleged losses incurred by defendant as a result of the seizure and receivership of his Dominican business and properties by the Dominican Government, from theft and shipwreck, and any depreciation of said properties."

ciency", was imposed on the taxpayer. It ruled that when this burden is met "the burden of proof shifts back to the Commissioner to prove the existence and amount of the deficiency", citing Foster v. C. I. R., 391 F.2d 727, 735 (4th Cir. 1968). *Id.* The government contends that this ruling is in conflict with long-standing precedent in this and other circuits. We agree.

■ At least since 1942, it has been the law in this circuit that "where a taxpayer petitions the Board for redetermination of a deficiency found by the Commissioner, the taxpayer has the burden of proving that the Commissioner's determination was wrong." Chicago Stock Yards Co. v. C. I. R., 129 F.2d 937, 948 (1st Cir. 1942), rev'd on other grounds, 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086 (1943). *See also* Sharaf v. C. I. R., 224 F.2d 570, 572 (1st Cir. 1955); General Aggregates Corp. v. C. I. R., 313 F.2d 25, 27 (1st Cir. 1963); C. I. R. v. Young Motor Co., 316 F.2d 267, 270 (1st Cir. 1963); Worcester v. C. I. R., 370 F.2d 713, 715 (1st Cir. 1966). This rule for taxpayer-initiated suits is premised on several factors other than the normal evidentiary rule imposing proof obligations on the moving party: the relevant prior Supreme Court precedent indicative, if not determinative of the issue. Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184 (1927); Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L. Ed. 212 (1933); Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Bull v. United States, 295 U.S. 247, 260, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); the presumption of administrative regularity; the likelihood that the taxpayer will have access to the relevant information; and the desirability of bolstering the record-keeping requirements of the Code.

Whatever uncertainty may once have existed because of our use of the general phrase "burden of proof" was dispelled by our opinion in United Aniline Co. v. C. I. R., 316 F.2d 701 (1st Cir. 1963). We there explicitly rejected the suggestion of the Fourth Circuit in Stout v. C. I. R., 273 F.2d 345, 350 (4th Cir. 1959), that the Commissioner's assessment merely shifts to the taxpayer the burden of going forward with evidence, and disapproved the use of the term "presumption" because of the danger, illustrated in Clark v. C. I. R., 266 F.2d 698 (9th Cir. 1959), of misleading courts into believing that if the taxpayer introduced evidence from which it "could" be found that the assessment was erroneous, the burden of proof was placed on the Commissioner. We unambiguously stated that whether or not reference was made to a presumption, it must be made clear that "the taxpayer never loses the burden of proving the Commissioner's determination erroneous." 316 F.2d at 704; *see also* n. 4, "Presumption or no, the burden of proof never shifts."

■ The district court in finding that the burden can shift to the Commissioner relied on *Foster, supra,* a subsequent Fourth Circuit deficiency case, which said that the initial burden on the taxpayer is merely procedural, requiring only evidence from which it could be found that the deficiency was wrong, and that once met, the burden was on the Commissioner to prove the existence and amount of the deficiency. That decision rested explicitly on such earlier cases as *Stout* and *Clark, supra,* which we had equally explicitly considered and rejected in *United Aniline.* We have been presented with no reasons why we should reconsider our rejection of *Stout, Clark* and their progeny, and our holding in *United Aniline.* Therefore, insofar as *Foster* may be deemed inconsistent with the rule enunciated in *United Aniline* and followed in the other circuits,[3] we reject *Foster* and reaffirm

---

3. *See, e. g.,* United States v. Lease, 346 F.2d 696 (2d Cir. 1965); Lesser v. United States, 368 F.2d 306 (2d Cir. 1966) (*en banc*); Diamond Bros. Co. v. C.I.R., 322 F.2d 725 (3d Cir. 1963); Psaty v. United States, 442 F.2d 1154

our holding in *United Aniline* that in a deficiency or refund suit, the burdens of going forward and of ultimate persuasion are always on the taxpayer and never shift to the Commissioner.

Taxpayer does not challenge the holding of *United Aniline* but rather suggests that the rule may be different, as the district court's opinion indicated, when, as here, the government sues to collect taxes. This proposal, that the burden of proof shifts when the government is the moving party, either in a collection suit or on a counterclaim to a taxpayer refund suit, has been rejected by other circuits, *Lease, Lesser, Psaty, Bar L, Liddon, Thrash, Plisco, supra*,[4] and for sound reasons. To place the burden of persuasion on the government when it moves to collect assessed taxes would encourage taxpayer delay and inaction, thereby imposing on the government the costs and burdens both of borrowing money to meet the gap of unpaid taxes and of initiating litigation. It would also undermine the record-keeping requirements, thereby making the government's case more difficult if not impossible to establish. We therefore hold that in tax collection suits or on government counterclaims, as in tax deficiency or refund suits, the burdens of both going forward and ultimate persuasion are on the taxpayer.[5]

■ Since we find that the district court employed the wrong burden of proof rule, we must remand. We are, however, unable to determine from the record before us whether the taxpayer,[6]

(3d Cir. 1971); Bar L Ranch, Inc. v. Phinney, 426 F.2d 995 (5th Cir. 1970); Liddon v. United States, 448 F.2d 509 (5th Cir. 1971); Trash v. O'Donnell, 448 F.2d 886 (5th Cir. 1971); Weir v. C.I.R., 283 F.2d 675 (6th Cir. 1960); Ehlers v. Vinal, 382 F.2d 58 (8th Cir. 1967); Plisco v. United States, 113 U.S. App.D.C. 177, 306 F.2d 784 (D.C.Cir. 1962).

In fairness to *Foster* and the cases it cites, we are not persuaded that they are necessarily in conflict with the prevailing rule. What has led to difficulty has been the language of those cases, tending to confuse or obscure two subsidiary components of the burden of proof rule. First, language regarding the Commissioner's obligation to prove the existence and amount of the deficiency apparently stems from Helvering v. Taylor, *supra*, which held that once a taxpayer in a deficiency case has borne his burden of proving the Commissioner's determination invalid, he has no further obligation to show that no money is owed, or, if some, how much. But this happy state is reached only if the predicate is fulfilled, i. e., *only if* the taxpayer has carried his burden of persuading the factfinder that the deficiency was erroneous. 293 U.S. at 513, 514, 515, 55 S.Ct. 287. *Foster* and its predecessors may be read as only reiterating the concept. Second, language relating to the disappearance of the "presumption", found in Clark, Cohen v. C.I.R., 266 F.2d 5, 11 (9th Cir. 1959) and more recently in Herbert v. C.I.R., 377 F.2d 65, 69 (9th Cir. 1967),

would seem to refer not to a shifting of the ultimate burden of persuasion to the Commissioner but to the fateful consequences for him if, in the face of taxpayer's initial presentation of evidence proving the deficiency erroneous, there is added to the record (whether from the Commissioner's or the taxpayer's witnesses or documents) no contradictory evidence supporting the bare assessment. *See Sharaf, supra.* Lawrence v. C.I.R., 143 F.2d 456 (9th Cir. 1944), the other case cited by the district court, stands for this proposition.

4. *But see* United States v. Molitor, 337 F.2d 917 (9th Cir. 1964). In *Molitor*, the government itself suggested that it had the ultimate burden, a proposition the court was understandably not concerned with rejecting. Its lengthy citation of United States v. Rindskopf, 105 U.S. 418 (1881), does not seem to us dispositive of the issue because the suit there was in part against third parties, sureties on a distiller's bond, a condition of which was compliance with all relevant laws, as against whom the general tax burden of proof would seem unfair.

5. Of course, as to fraud assessments, both burdens are always on the government, see 26 U.S.C. § 7454(a); *Worcester, supra*, 370 F.2d at 717, which the court recognized.

6. Since, if the government thought it carried the burden it would presumably have made a more extensive effort than necessary under the proper rule, the only cir-

at the time that he prepared and presented evidence, labored under the same misconception as the deciding court. We have found some statements, most significantly in the opening remarks of both parties at the first trial, which strongly suggest that the case was tried by judge and parties alike under the assumption that the taxpayer had the burden of disproving the assessment, the government being required to prove only the fraud allegations. We do not, however, have before us the briefs and memoranda of law submitted by the parties over the years to the district court, which might elucidate this problem. Nor, of course, do we have a record of any informal discussions between the parties or conferences with the court. We therefore are not in a position to decide whether the district court, on remand, may properly restrict its reconsideration to the existing record, or whether the taxpayer reasonably relied on a mistaken understanding of the distribution of evidentiary burdens so that he must, in fairness, be permitted to supplement the record, as the government would then also be entitled to do, now that the mistake has been corrected. Thus, on remand, the district court should first decide, on the transcripts and briefs if possible, and after hearing if necessary, whether the taxpayer suffered as to some or all of the issues from an erroneous, though reasonable, misunderstanding of his evidentiary burden and therefore whether the record should be reopened. We recapitulate, at the close of this opinion, the implications for both parties of a closed, versus an open, record.

II. 1959 Items—Deductions for Kickbacks on the Azua and Customs House Contracts

Taxpayer reported in his 1959 return contract payments on two construction projects in the Dominican Republic, one at the Port of Azua and the other a customs house in Ciudad Trujillo. The Azua contract was awarded in early 1956 and the project completed 35 months later in March, 1959, taxpayer receiving a basic payment of $4,750,000. The customs house contract was awarded in August, 1958, and construction terminated 15 months later in October, 1959, taxpayer receiving a basic payment of $7,000,000. Taxpayer and the Commissioner had agreed, in connection with earlier litigation, including these same contracts, to employ an accounting method whereby the original gross contract price was divided by the number of months duration for each contract, thereby giving an estimated monthly payment on the assumption that the project had progressed to completion at a constant rate. After all monthly payments in a tax year were totalled, profit were computed as $\frac{1}{11}$th of the total, the equivalent of a 10 per cent profit margin. Taxpayer chose this same method here when he filed his 1959 return and accordingly a profit margin of 10 per cent was claimed for the sums assigned to that year. This accounting method, though not the particular profit margin, is essentially identical to the percentage of completion method which is explicitly authorized by the Commissioner, 26 C.F.R. § 1.451–3(b)(1).

Auditing of taxpayer's 1959 return was made by sending an Internal Revenue agent and an engineering expert to the Dominican Republic to examine his records which had been sequestered by the post-Trujillo government. Only a limited viewing of the records and more extensive inspection of some of the actual construction projects, including the Azua project but not the customs house project, was permitted. From interviews with workmen, supervisors, material vendors, local engineers and contractors and from the actual inspection, the engineer estimated that "the aggregate cost of all work will not exceed 40 to 45 percent of the contract payments." Working from a 42.5 per cent figure,

cumstance which could have prejudiced either party, would seem to be the taxpayer's belief that the government bore the evidentiary burden.

the Commissioner filed suit against taxpayer, alleging that a profit of 57.5 per cent was earned on the Azua and customs house contracts and seeking the additional tax thereon.

Taxpayer's defense to these claims is three-fold. First, he alleges that since the government adopted the 10 per cent profit rule for the years 1951–1958, which included part of the work on the Azua and customs house contracts in those years, it is estopped from prohibiting him from using the same formula for these projects in 1959. He particularly relies on Tait v. Western Maryland R.R. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405 (1933) and Thomas v. C. I. R., 324 F.2d 798 (5th Cir. 1963), which the district court cited in sustaining taxpayer's position. Those cases, however, do not help him. In *Tait*, a second court which was merely determining tax liability based upon the same evidence presented to a first court was foreclosed from making different factual findings. And in *Thomas* the court expressly stated that where the operation of a farm for one year was found by a jury to be as a business for profit, another court may, while giving consideration to that finding, determine upon substantial evidence that for subsequent years the farm was not run as a bona fide business.

■■ Both these cases recognize the basic rule that "each year is the origin of a new liability and of a separate cause of action", C. I. R. v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). This is most relevant here

since "the controlling facts and applicable legal rules" are said to have changed in this litigation as compared to the prior cases dealing with the earlier years 1951–1958. *Id*. at 600, 68 S.Ct. at 720. Specifically considering only a change in facts, sufficient to fall within the *Sunnen* rule, the 10 per cent profit margin here for the years 1951–1958 was selected by the Commissioner as the usual amount of profit to be expected on such construction contracts, especially since taxpayer professed to be without any business records. Something new was added by the visit to the Dominican Republic, where inspection of some of taxpayer's books and actual work was permitted in 1962. This revealed important new evidence. No impressive policy reason has been offered to preclude the government from using this evidence in determining taxpayer's 1959 tax liability.

In any event, the most basic premise for utilizing the concept of collateral estoppel—that there be a prior judgment on the merits—is absent in this case. United States v. International Building Co., 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953). The stipulation as to a 10 per cent profit, which ended the government's suits for taxes due in 1951–1958, was not a decision on the merits that such profit had in fact been realized, but rather only a best estimate, specifically limited to those years and accepted by both sides, based on the then-available information. On the facts of this case, any invocation of estoppel would constitute a misapplication of equitable principles underlying the doctrine.[7]

---

7. We also reject taxpayer's argument of "quasi-estoppel" which is based essentially on the consideration of equitable factors. First, we note that this doctrine has been expressly rejected in this circuit. Ross v. C.I.R., 169 F.2d 483, 494 (1st Cir. 1948) (Frankfurter, Circuit Justice); 10 Mertens Law of Federal Income Taxation ¶ 60.04 at 16, n. 50 (1972). Moreover, as it is grounded in equity, we do not see how the government can be said to have "profited" from the prior stipulation as to a 10% profit margin in 1951–1958, nor do we see here any detriment to taxpayer, other than payment of taxes lawfully due, resulting from the Commissioner's recent evaluation of profits earned on these contracts in 1959. *See generally*, Lynn & Gerson, Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies, 19 Tax L.Rev. 487, 489 n. 10 (1964). We must conclude that taxpayer's reliance on this doctrine is nothing more than a restatement of his already rejected claim of collateral estoppel.

Second, taxpayer alleges that the 57.5 per cent profit fails to take account of the 33⅓ per cent kickback made to Trujillo. Aside from the fact that taxpayer had previously stated at a trial that he had never made any kickbacks to the Dominican Republic, both he and the district court wrongly interpreted the 1959 amendment to § 162 of the Internal Revenue Code. Section 5(a) of the Technical Amendments Act of 1958 added a new paragraph to read:

*"Improper payments to officials or employees of foreign countries.*—No deduction shall be allowed under subsection (a) [of section 162 relating to ordinary and necessary business expenses] for any expenses paid or incurred if the payment thereof is made, directly or indirectly, to an official or employee of a foreign country, and if the making of the payment would be unlawful under the laws of the United States, if such laws were applicable to such payment and to such official or employee." 26 U.S.C. § 162(c).

The effective date of this amendment is stated as follows:

"The amendment . . . shall apply only with respect to expenses paid or incurred after the date of the enactment of this Act [September 2, 1958]. The determination as to whether any expense paid or incurred on or before the date of the enactment of this Act shall be allowed as a deduction shall be made as if this section had not been enacted . . . ." P.L. 85–866, § 5(b) (Sept. 2, 1958), U.S.Cong. & Admin.News, 85th Cong., 2d Sess., pp. 1927–1928.

The district court reasoned that since taxpayer's obligation to kick back one-third of the contract price was "incurred" prior to September 2, 1958, the deduction should be allowed "as if this section had not been enacted".

■ The relevant language for taxpayer, however, is not "expenses . . . incurred", but rather "expenses paid". In referring separately to these times, which may or may not coincide in some transactions, the statute avoids redundancy only if Congress is understood as merely recognizing that there are generally two systems of accounting followed by most taxpayers— the cash receipts and disbursements method and the accrual method. *See generally* 26 C.F.R. § 1.446–1(c). For the taxpayer on the cash receipts or disbursements method, or other permissible methods which focus upon the actual exchange of cash, 26 C.F.R. § 1.446–1(c)(iii), cash payments made prior to September 2, 1958, which might have been permitted to be deducted absent the new amendment on kickbacks, were not to be affected by the new provision. For the taxpayer on the accrual method, or other methods where the time the obligation is incurred is important, obligations incurred prior to September 2, 1958, no matter when paid, were not to be affected.

■■ The district court found that it was not proven whether the kickbacks were made before or after September 2, 1958. Under our interpretation of the statute, and the accounting system used by taxpayer, this unknown fact is irrelevant. Taxpayer, having selected the "percentage of completion method" as to his long-term contracts, was permitted to deduct only "all expenditures *made* during the taxable year in connection with the contract". 26 C.F.R. § 1.-451–3(b)(1). [Emphasis added.] If all of the kickbacks, or any portions thereof, were made prior to September 2, 1958, they could have been deducted only in those years under § 1.451–3(b)(1) and the new statute of course would not affect that case. But to the extent that any kickbacks were made in 1959, the taxable year here in question, the new law clearly forbids a deduction based thereon. Thus, the timing of the kickback payments on the Azua and customs house contracts does not change the re-

sult that there can be no tax benefit to taxpayer in 1959.[8]

Last, taxpayer claims that the government has not met its burden of proof to show that his profits were 57.5 per cent on the Azua and customs house contracts. Though to be sure, the Commissiner's failure to specify in detail the persons interviewed or documents relied upon in regard to each project leaves something to be desired, especially since only the Azua project was actually viewed, the government, as we have ruled earlier, did not have the burden of proof. Moreover, coming at the issue from another direction, there were admitted kickbacks which consumed one-third of the contract price, and on both projects taxpayer paid income taxes to the Dominican Republic in 1957 and 1958 based on the determination that his profits were equal to 25 per cent of his gross income. The kickbacks and acknowledged profit together approximated a 58 per cent assessed profit since the kickbacks, as we have said, cannot be deducted.[9]

■ However inexact the government's assessment might be, on the present record the taxpayer must be found not to have carried his burden with regard to the Azua and customs house contracts. As he admits in his brief to this court, he presented no evidence regarding the actual profits earned on those contracts; he merely asserted his opinion that no contractor could earn the percentage assessed by the government, that 5 to 6 per cent was normal, and that he lost money on the customs house contract. As a matter of law, this was inadequate evidence of the

deficiency's incorrectness. Thus, unless the district court finds, upon remand, that the taxpayer, as stated earlier, erroneously and reasonably relied on the government having the burden of proof, the government's assessment must stand.

### III. 1961 Items—Boca Chica and Yuna Contracts

#### A. Boca Chica Contract Payment

In the years 1955–1958, the taxpayer performed and completed work on a contract for the construction of a pier, road and warehouse and the dredging of the entrance channel of the bay at Boca Chica in the Dominican Republic. He received in those years total payments of $3,880,000. As stated earlier, it was determined by the Commissioner and stipulated between the parties that the taxpayer earned profits of $\frac{1}{11}$th of the contract payments received in the years of receipt (equivalent to costs plus 10 per cent). In a deposition given before the stipulation, taxpayer asserted that in fact he had made no profit on the Boca Chica contract but suffered a loss in excess of $1,000,000. He claims that he consented to the Commissioner's computation because of fear for his personal safety and future standing with Trujillo were he to divulge the alleged $33\frac{1}{3}$ per cent kickback payments which were a major part of his expenses. At that time he had pending with the Trujillo government a claim for some $3,750,000 for compensation for the extra cost of dredging 1,000,000 cubic yards of rock, which had not been anticipated in the original contract and which all, including the government's expert, agree is far harder and more expensive to re-

---

8. We also reject the district court's ruling that the new amendment was inapplicable because taxpayer's payments were not to an "official or employee of a foreign country", but rather to the government of that country itself, embodied in dictator Trujillo. We see no logic in disallowing deductions for payments to a top elected official but in allowing such for payments to one who has seized absolute power. Whatever other governmental programs

may be said to have subsidized dictators, Congress cannot be said to have chosen this particular tax route.

9. We hasten to add that our reading of the record indicates the Dominican tax was not being used, despite taxpayer's contention, as a basis for the United States assessment, but rather as an additional check on the reasonableness of the Commissioner's findings.

move than the silt and other softer materials which had been predicted.

In 1961, just before Trujillo's death, as we have earlier noted, the dictator approved a settlement of this claim in the amount of $1,552,000, which taxpayer immediately paid back to the Dominican government for taxes allegedly due for the years 1951–1958. That payment was then successfully claimed by taxpayer as a foreign tax credit against his American tax liabilities for those years. The government, having in its second amended complaint, elected to treat the $1,552,000 payment as extra compensation rather than a sham, claims that all of the payment was taxable income of the taxpayer in 1961. The taxpayer below claimed and personally testified that he had in fact incurred a substantial loss on the Boca Chica contract, in excess even of this large payment. The district court, accepting his testimony, and finding that he had incurred substantial losses in those earlier years, which were only partially compensated for by the 1961 payment, held that it would be "manifestly unjust and not in accordance with law, to now assess a federal income tax on any part of the said payment." 331 F.Supp. at 542.

The government contends that under settled principles of tax law the payment in 1961 was then taxable as income, even if it was in fact compensation for expenses incurred in a prior tax years; and that in any case, the prior stipulated 1/11th rate of profit on the contract in 1955–1958, through the operation of res judicata and collateral estoppel, bars the present claim that taxpayer in fact lost money in the performance of that contract. The taxpayer argues that the prior determination was merely based on a stipulation into which the taxpayer was coerced and was due to a mistake of law on the Commissioner's part; that it therefore does not prevent present examination of the actual results of the Boca Chica contract; and that substantial evidence supported the district court's finding of a substantial loss not fully

compensated. While, for reasons already indicated, the taxpayer might not be estopped from proving that he in fact suffered a loss from the contract as to which he had previously stipulated a profit, United States v. International Building Co., supra, we conclude that under existing precedent, even such proof cannot overcome the government's assessment of the 1961 payment as income in that year.

In 1931, the Supreme Court, in a seminal case frequently since reaffirmed, held, on nearly identical facts, that a later payment in compensation for expenditures made on a contract which had resulted, during its performance, in net tax losses, was taxable as income in the year of its receipt. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931). The taxpayer there performed a contract with the United States government to dredge the Delaware River. In each of the four years of the contract's · performance, 1913–1916, the taxpayer added to gross income for each year the payments made on the contract in that year and deducted its expenses paid that year in performing the contract. In three of those years, the expenses exceeded the payments; the total loss on the contract was $176,271.88. A judgment for the taxpayer for that sum plus interest for breach of warranty as to the character of the material to be dredged was affirmed by the Supreme Court in 1920. In the subsequent tax deficiency suit, the Court held that the Commissioner properly assessed all of the judgment as an addition to gross income. The Court stated that the recovery in 1920 was gross income for that year, even though "it equalled, and in a loose sense was a return of, expenditures made in performing the contract." 282 U.S. at 363, 51 S.Ct. at 151. "The excess of gross income over deductions did not any the less constitute net income for the taxable period because respondent, in an earlier period, suffered net losses in the conduct of its business which were in

some measure attributable to expenditures made to produce the net income of the later period." *Id.* at 364, 51 S.Ct. at 151–152. The Court's reasoning was that the tax laws proceeded under an annual system of accounting in which all receipts and payments (or accruals of same) in one year were to be counted for purposes of computing the tax for that period. The Court concluded that while "a different system might be devised by which the tax could be assessed, wholly or in part, on the basis of the finally ascertained results of particular transactions", *id.* at 365, 51 S.Ct. at 152, Congress had not so chosen and its choice of annualization-of-income was not unconstitutional.

Although the Supreme Court has not since *Sanford* decided another case of precisely its species, it has repeatedly cited it with approval, when dealing with tax transactions of a similar ilk, for its annualization-of-income principle that payments made and received be accounted for only in the year of payment or receipt. *See* Guaranty Trust Co. v. C.I.R., 303 U.S. 493, 498, 58 S.Ct. 673, 82 L.Ed. 975 (1938); Dobson v. C.I.R., 320 U.S. 489, 504, 64 S.Ct. 239, 88 L.Ed. 248 (1943); Security Mills Co. v. C.I.R., 321 U.S. 281, 286, 64 S.Ct. 596, 88 L.Ed. 725 (1944); Lewyt Corp. v. C.I.R., 349 U.S. 237, 250, 75 S.Ct. 736, 99 L.Ed. 1029 (1955). Most analogous are its rulings under the "claim of right" doctrine, launched the year after *Sanford* in North American Oil v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932). There the Court established the rule that "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income . . . even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *Id.* at 424, 52 S.Ct. at 615. *See also* United States v. Lewis, 340 U.S. 590, 592, 71 S.Ct. 522, 95 L.Ed. 560 (1951); United States v. Skelly Oil Corp., 394 U.S. 678, 680–681, 684, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969). Just as one who presently receives payment on a claim must consider it as income for tax purposes though it appears, even at the time of receipt, that he may later have to pay back some or all of that receipt, so one who in a prior year had losses which are now compensated must consider the later payment as income for tax purposes.

Lower courts have followed *Sanford,* when confronted with analogous facts. In C.I.R. v. John Thatcher & Son, 76 F. 2d 900 (2d Cir. 1935), the court held that a contractor could not deduct as a loss the .extra expenses incurred on a contract because of the default of his subcontractors, in the year in which this suit on the default was finally adjudicated against him, but only in the year when actually paid. In so concluding, the court stated that had the suit been successful, "such recovery would have been income in the year when received" citing *Sanford* which it thought governed the case before it. 76 F.2d at 901. More recently, in H. W. Nelson Co. v. United States, 158 Ct.Cl. 629, 308 F.2d 950 (1962), the Court of Claims held that a payment received in 1941 as settlement of a judgment in a suit arising from a contract performed and completed in the years 1928–1931 was taxable as income in 1941 under *Sanford* even though the payment constituted recoupment of expenses in the performance of the contract. The court noted that the only difference between *Nelson* and *Sanford* was that in the former the taxpayer used the completed contract basis of accounting and in the latter the annual cash basis of accounting was employed. It found this difference without significance because the contract was completed in 1931, at which time, under the applicable or any other system of accounting, all expenses and receipts under the contract would have been taken into account.

This case is precisely governed by *Sanford* and *Nelson.* Taxpayer performed and completed a contract for dredging between 1955 and 1958 and his tax liability for those years was calculat-

ed, under the percentage of completion formula, 26 C.F.R. § 1.451–3(b)(1), according to the receipts and expenses in those years. His receipt in 1961, even though arguably a recoupment for losses incurred in those prior years, must be considered as income in 1961, regardless of the accounting system used in the years of performance, if the annual accounting principle is to be maintained and Congress' rejection of a system of reopening to assess the final results of a particular transaction or contract is to be upheld.

Although neither party has briefed or argued the point, we have considered whether the so-called "tax benefit" rule applies to this amount which we have found is includible as gross income in 1961. Under that rule, the amounts recovered in a later year for losses or expenditures previously deducted are excluded from gross income to the extent that the prior deductions did not result in a tax benefit to the taxpayer in that prior year. 26 U.S.C. § 111; 26 C.F.R. § 1.111–1. Assuming without deciding that the type of losses here alleged are subject to the tax benefit rule, *compare* Lloyd Faidley v. C.I.R., 8 T.C. 1170 (1947) *with* Plumb, The Tax Benefit Rule Today, 57 Harv.L.Rev. 129, 130 (1943), we still must conclude that taxpayer may not invoke the rule, since he did not actually claim as deductions in the prior years the losses which he now alleges are compensated by the 1961 payment.

As we have previously held, "[U]nder the rule contended for an amount recovered can be excluded from gross income in the year of recovery only when the amount involved was deducted in some prior year." Mathey v. C.I.R., 177 F.2d 259, 264 (1st Cir. 1949). The Tax Court came to the same conclusion in First National Bank v. C.I.R., 22 T.C. 209 (1954), aff'd without opinion, 221 F.2d 959 (2d Cir.), cert. denied, 350 U. S. 887, 76 S.Ct. 138, 100 L.Ed. 782 (1955), reasoning that had Congress, and we might add the Commissioner, intended to have applied the rule to deduc-

tions for prior years which were not but could then have been claimed, reference would have been made to "deductions which could have been claimed" and "[deductions] which [would] not [have] result[ed] in a reduction of the taxpayer's tax" rather than to "deductions or credits allowed", "[items] . . . of which a deduction [or credit] was allowed for a prior taxable year" and "[deductions,] which did not result in a reduction of . . . tax". 26 U.S.C. § 111(b), 26 C.F.R. § 1.111–1(a). Sound policy would also seem to dictate this common sense reading of the statute and regulation. Were taxpayers free to claim a recovery exclusion for expenditures allegedly made in a prior year but not actually claimed, the Commissioner and the courts would be required to recompute prior, frequently very old tax returns, *see First National Bank, supra,* based on stale and often, as here, inadequate evidence. Moreover, permitting such a belated claim of prior allowable deductions could produce fraudulent claims of prior expenses to improve the taxpayer's status in later years of higher income. For these reasons, we reaffirm our holding in *Mathey* that the tax benefit rule only applies when the losses later recovered were actually deducted in the relevant prior years.

B. The Yuma Contract

Taxpayer's 1961 return included $408,934.72 in expenses on the Yuna contract which were offset against contract payments of $200,000, thereby producing a loss of $208,934.72. The government rejected this claimed loss and applied its 57.5 per cent profit calculation to this contract. While, because of the reliance placed by the district court on its view that the government bore the burden of proof, this issue must be reconsidered, we think it proper to comment on several evidentiary problems.

The Yuna contract was executed on April 9, 1961, and contemplated payments of $4,700,000 for dredging and other work in reclamation of a large

land area and making the Yuna and Barracote Rivers navigable. After dictator Trujillo was assassinated on May 30, 1961, this contract was cancelled by the new government on July 14, 1961. Taxpayer requested additional payment, other than the initial $200,000, from the new government to cover his allegedly greater costs. He testified that the Secretary of Public Works for the Dominican Republic subsequently concluded that he was entitled to $800,000 for dredging costs, but taxpayer is presently contesting that amount through diplomatic channels as being too low. The alleged losses noted in his testimony, scattered throughout the trial, include the approximate expenses of items such as wages and supplies, and estimates of around 40 cents a cubic yard for the actual dredging.

Additional evidence was presented to justify taxpayer's claims in the form of a so-called accounting register, labeled, quite significantly we believe, "Income and Disbursements Book—Yuna Project —Period: April 1, 1961–March 31, 1962". No one could explain why and how this book, in contrast with all of taxpayer's other sequestered records, was removed from the Dominican Republic in the early 1960's. The only identification of the register was by taxpayer who said that he ordered its preparation at the time of the project, and that it was in the handwriting of his accountant. The entries in the register total $545,310.66, but taxpayer deducted only $408,934.72, an amount determined by the deceased accountant. Taxpayer could not say exactly which items were included by the accountant, and which were not, in the amount deducted. Nevertheless, since taxpayer's primary records from which the register was allegedly prepared were sequestered after the death of Trujillo, and were unavailable at the commencement of the unfinished trial begun in 1966, the late Judge Ruiz Nazario admitted the register into evidence.

At the latest stage of these proceedings before the district court, the government moved to strike the register from evidence. Its basis was that, as a result of its agent examining, in 1967, the primary records held in the Dominican Republic, which had been returned to taxpayer's control after the earlier proceedings were suspended, it had discovered numerous items listed as actual expenses for the Yuna project which were, in fact, admittedly personal expenses of taxpayer. The agent brought to Puerto Rico only a small part, some 150 pounds, of these primary records as samples to compare with the register and he found a total of approximately $41,000 listed as business expenses to be personal in nature. Relying upon the claimed unreliability of the register, the present availability of the primary records, and the alleged wrongful initial admission of the register into evidence, the government moved that it now be struck.

Whatever doubts we may have as to the correctness of the original admission into evidence of the register, we think that the trial court erred in not striking it after the testimony of the government agent. To be sure, where there are a large number of documents which would be impracticable to produce in court and read aloud, it has been said that a summary of the documents should be admissible. 4 Wigmore on Evidence § 1230, at 434 (1940). At a minimum, however, "the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in court, or at least be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available." Id. Thus, for example, we approved of such a procedure in Yoffe v. United States, 153 F.2d 570, 574 (1st Cir. 1946), in part because the ledger sheets there were present throughout the trial. See also Rule 1006 of the proposed Rules of Evidence for United States Courts and Magistrates.

In the instant case there were hundreds, perhaps thousands, of documents

relating to the Yuna project which were purportedly summarized by the deceased accountant in the register. Taxpayer permitted inspection of these documents by the United States agent in October and December of 1967 in the Dominican Republic where, owing to the vast numbers involved, only samples were taken back to Puerto Rico for the more detailed analysis which subsequently revealed the numerous personal expenses included in the register. However, taxpayer chose to leave the remainder of these documents in the Dominican Republic and, quite understandably, objected when the government served him, on August 17, 1970, during a three-week recess in the instant trial, with a notice to produce all of those documents with respect to relevant bank accounts involving the Yuna project.

Though the government's request for production came lamentably late, we refer to our discussion of burden of proof. Were the government to have had that burden, its delinquency in assuring. the presence of all relevant records could probably have been held against it. But the burden was, as we hold, that of taxpayer, who might therefore have been expected to produce such records or have them more easily accessible. Taxpayer left those records in the Dominican Republic at his peril. Even though the original primary documents might properly have been summarized and thus admitted into evidence, we think that in the circumstances of this case where there is grave doubt as to the reliability of the register's summary, and the missing original writings in dispute are the very foundation of the claim, greater access to these primary records during trial was required than that afforded by taxpayer. *See generally* Sylvania Products, Inc. v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965); John Irving Shoe Co. v. Dugan, 93 F.2d 711 (1st Cir. 1937). This is especially so here in light of the strong evidence presented by the government agent as to the questionable trustworthiness of the register. Though taxpayer states that over

$130,000 of the expenses listed in the register were not taken as business deductions, and that the sum total of personal expenses testified to by the agent was slightly over $41,000—well within the unclaimed amount—we are troubled by the inability of anyone to say what expenses of those listed were actually deducted and why, in the first place, the personal expenses were in a register clearly labeled as Yuna project expenses. Only the production of the primary records can overcome the substantial shadow which has been cast upon the reliability of the register.

Complicating the issues in this case is the fact that prior to this last retrial stage of the proceedings, the parties had stipulated that the retrial would be on "all the evidence adduced" at the first trial with the relevant exception here that the government could utilize "such relevant testimony of [its agent] concerning the records of [taxpayer] which were recovered from the Dominican Republic after the prior trial . . . ." Taxpayer interprets this stipulation as prohibiting the motion to strike the register, especially since he alleges that under the stipulation, he could not introduce any additional evidence.of the Yuna deductions which might inhere in the primary records in question.

Whatever might have been the result had no exception clause been included in the stipulation, we do not think that in its present form it precludes the government's motion to strike. The clear exception for the testimony of its agent leaves the door open to the government to make whatever motion, procedural, evidentiary or otherwise, which might logically follow as a result of the new testimony. *Cf.* Randolph v. Missouri-Kansas-Texas R. Co., 100 F.Supp. 139 (W.D.Mo.1951). Moreover, if the stipulation were found to allow only the government to introduce evidence of the primary records for impeachment purposes, and taxpayer were precluded from introducing the remainder of the primary records to substantiate his claim,

taxpayer could request the district court, in its discretion, to relieve him of the stipulation. *See, e. g.,* Central Distributors, Inc. v. M.E.T., Inc., 403 F.2d 943 (5th Cir. 1968).

Although we have found that under the present circumstances, the register should have been stricken from the record, we do not suggest that the register may not ultimately be admitted into evidence or that taxpayer will be unable to meet his burden of proof. Taxpayer is free to bring his documents to Puerto Rico, *Flanagan, supra,* 352 F.2d at 1008–1009, or to make other arrangements for access consistent with his burden. Moreover, we are unimpressed with the government's evidence thus far as to the Yuna contract. The actual construction site was never visited, and unlike the customs house project, this project was abruptly forced to a halt with attendant problems which are not found in fully completed projects. We do not, of course, resolve the question of the propriety of the Commissioner's assessment here, assuming that on remand, the imposition of the burden of proof on the taxpayer will result in a more satisfactory evidentiary basis for a finding.

## IV. Depreciation and Theft Loss Deductions

### A. Depreciation

The taxpayer claimed and the district court found that the taxpayer was entitled to deductions of $130,338. for each of the years from 1960 through 1965 for depreciation primarily of a graving dock, a dredge, and several ships. The court also found that because of these deductions, the taxpayer sustained a net loss in those tax years, which losses may be carried back two years and forward five years from the year in which the losses were sustained, pursuant to 26 U. S.C. § 172. Because of these carry-back provisions, the taxpayer was able to offset all of the few items of income found by the district court (the Escambron constructive dividend and the New York

bank account interest) except for the $432. of self-employment taxes held due for the years here at issue.

The government claims that the taxpayer failed to carry his burden of proving by competent evidence his costs and ownership of the assets for which depreciation is claimed. The taxpayer claims that he did meet that burden and that the court's findings regarding depreciation deductions was supported by the record and not erroneous. Although the briefs here, the relevant parts of the record, and even the brief section of the district court opinion on depreciation suggest to us that in fact the parties were proceeding as to this issue on the correct assumption, i. e., that the taxpayer had to establish his deductions, we leave it, as we stated earlier, for the district court to decide whether in fact the parties presented evidence on a proper understanding of the distribution of their proof burdens and if so, to restrict its decision on remand to the existing record.

Though we remand for reconsideration, it is appropriate to discuss the government's major evidentiary and legal arguments at this juncture. This requires a brief statement of the existing record on point. Taxpayer introduced in evidence a depreciation schedule for the relevant assets providing the yearly figure of $130,338. This had been prepared by his accountant in 1970. Testimony revealed that this schedule was prepared, as to the dredge and ships, from the taxpayer's testimony at the first trial, supplied to the accountant by his attorney; and, as to the graving dock and accompanying equipment, from the taxpayer's own written estimate in 1959 of the costs of those assets, which was also a taxpayer exhibit. Despite arguably contradictory testimony, the taxpayer at both trials ultimately asserted that these were estimates of costs, not value in later years. Regarding ownership of the assets, while taxpayer admitted that the full cost of the dredge was originally loaned to him by dictator Trujillo, he testified, albeit after unrespon-

sive answers, that he repaid the first third in the years before 1958 and the remainder in 1961, out of payments made to him in that year on various other contracts. As to the graving dock, he testified and still claims that there was an arrangement under which the government would provide the land and he would construct the dock and then transfer all of the property to a Dominican company which he would organize and capitalize at $3,000,000—of which shares worth $25,000 were to be given the government in payment for the land and the remainder to taxpayer. He explained that because of political conditions and the seizure of his assets, the company was not organized and the transfer made until 1970, at which time he was "proceeding" to issue the promised stock to the Dominican government.

 The government's primary complaint is that while the taxpayer has recovered his records, he produced none to substantiate his claimed costs and repayment of the alleged loan for the dredge. Again, as with the Yuna contract expenses, the argument has force. The depreciation schedule and the taxpayer's cost estimate for the dock are merely summary accounts of the original records of the actual costs of the listed assets. Both the taxpayer and his accountant testified that at least some records relating to these assets were extant and in his possession in the Dominican Republic. The government agent testified that there were eight filing cabinets and numerous boxes of checks, vouchers, contract copies, deposit slips, bank statements and other similar records at the graving dock. For the reasons we have previously noted, the taxpayer's schedule and estimate are admissible only if the underlying original records are made more available to the government. Indeed, as to these documents, production at the trial might be necessary, because the accountant testified that he had not seen any records in preparing the schedule, that he had originally refused taxpayer's counsel's request to prepare such a schedule precise-

ly because of the absence of such records, and acceded only after insistence by counsel that he make an attempt based on the first trial testimony of taxpayer, the written estimate, and conversations with taxpayer. Since we find that the district court improperly admitted the schedule and estimate without requiring production, or at least greater availability, of the voluminous underlying documents, the taxpayer must be given an opportunity to meet the prerequisite to admission of those documents, even if the record is otherwise restricted. *Flanagan, supra,* 352 F.2d at 1008–1009. If the prerequisite is not met, the taxpayer will necessarily have failed to carry his burden of proof as to all but the dredge and ships. As to those, there is the taxpayer's oral testimony, the credibility and hence sufficiency of which we cannot properly decide in the first instance.

The government also claims that under the taxpayer's own description of the arrangement for establishing a company to own the graving dock, he was not the owner and could not claim its depreciation as a deduction against his personal income. In this regard, we note that the only evidence presently is that the company was not formed until 1970. Thus, it would appear that in the relevant years the company was not the actual owner. However, the government asserts that incorporators and promoters of corporations in the process of formation are fiduciaries *inter se,* as in a joint venture, as well as fiduciaries for the organized corporation, citing hornbook law. It also argues that taxpayer is not entitled to the depreciation deductions because the test is whether the claimant suffers an economic loss because of the decrease in value of the property due to depreciation, 4 Merten's Law of Federal Income Taxation § 23.06; Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720 (1929), and he could not have suffered any such loss since he ultimately received exactly what he bargained for—i. e., all of the stock in the company to which the depreciable

assets were transferred, but for the $25,000 worth to be given the government in payment for the land. We do not resolve these claims, both because they were apparently not pressed below, the government raising them only in light of the taxpayer's brief here, and because there are no factual findings relevant to these issues.

We believe, however, that the first argument is irrelevant and the second inaccurately formulated. As the Court has long held, depreciation deductions are available not only to the legal title holder of the assets. Helvering v. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939) and cases cited therein. It thus matters not whether taxpayer held legal or equitable title in the relevant years, or whether he held title for his own business or as fiduciary of a company he was jointly promoting. The relevant test is whether taxpayer suffered actual and present rather than theoretical or anticipated economic loss from the depreciation of the assets in the years for which the deductions are claimed. Weiss v. Wiener, *supra*. In this regard it would seem unimportant whether he got in stock what he originally bargained for with his joint venturer. The relevant inquiry would seem to be whether as a result of the planned and later actual organization of the company, or for any other reason, taxpayer, in the years 1960–1964 suffered any economic loss from the depreciation of the assets in those years.

B. Theft Loss

The taxpayer also claimed and the district court found a theft loss deduction in the year 1962 for the dismantling and removal by thieves of all of the materials and equipment other than the hull constituting the "floating hotel", built by the taxpayer to house workers on the Yuna contract. At the time of the alleged theft, the "hotel" was in the control of the sequestrator. The government claims that the taxpayer has failed to carry his burden of proving the fact and the year of discovery of the theft and the amount of loss therefrom. The only statements by the district court relevant to this issue were a comment in the discussion of the Yuna contract that "To house his workmen taxpayer built a floating hotel the construction of which cost $90,000.00", 331 F.Supp. at 537, its ruling that "The loss in 1962 of the floating hotel through dismantling and theft of the materials of which constructed and the equipment installed therein constitutes a loss in 1962 and deductible under 26 U.S.C. § 165(a) and (e).", *id.* at 543; and a finding that the taxpayer's efforts at recovery on the claim had been unsuccessful. Because of our ruling on the burden of proof, and the incompleteness of the court's findings on this matter, we remand for reconsideration. If the record is not to be supplemented, because the taxpayer proceeded under a proper understanding of the burden of proof, we hold that he has failed to carry his burden in this regard and that the loss deduction for 1962 must therefore be disallowed.

The evidence supports a finding that in 1962, soon after the seizure of the taxpayer's property, unauthorized persons dismantled and removed all of the equipment and material constituting the floating hotel other than the barge on which it was constructed, which was returned to the taxpayer in 1966. The court's finding that the hotel, not including the barge, cost the taxpayer $90,000 to construct, is supported by the taxpayer's initial testimony to that effect, even though that was the highest of three estimates he gave. There was no specific discussion of the dates of its construction, but the taxpayer now argues in his brief, based on various other circumstances, that it must have been completed prior to April 1, 1961. It is enough to say, and we are certain neither side would quarrel with this, that the hotel must have been constructed in some year prior to 1962. There was also no testimony as to the fair market value of the hotel, not including the barge, immediately prior to the theft. Though there

was testimony that the theft occurred soon after the government seizure of the assets and that the taxpayer remained in the Dominican Republic for some five or six months after the seizure, there was no testimony as to the year when this theft was discovered by the taxpayer. Finally, while at one point, in 1965, taxpayer testified that a claim for this loss was pending in the Dominican courts, he later claimed that no recovery for such items was possible through the courts, in part because judgment could not be had against the government absent its consent, and that the only hope was, as the district court found, through diplomatic proceedings, which have now allegedly been pending without result for ten years.

The law on point is clear. A theft loss "shall be treated as sustained during the taxable year in which the taxpayer discovers such loss", 26 U.S.C. § 165(e), not the year in which the theft actually occurs, unless the two years are the same. 26 C.F.R. § 1.165–8(a)(2). However, "if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery", the loss is not deductible until the year in which the possibility of recovery "can be ascertained with reasonable certainty". 26 C.F.R. § 1.165–1(d)(3). The amount deductible is the lesser of either the "fair market value of the property immediately before" the theft or "the adjusted basis" as determined under 26 C.F.R. § 1.1011–1, except that if the property is used in a trade or business and the fair market value before theft is less than the adjusted basis, the latter shall be treated as the deductible amount. 26 C.F.R. §§ 1.165–7(b)(1); 1.165–8(c).

Here there was no finding as to the year of discovery, nor was one possible in light of the lack of evidence in the existing record. Moreover, while the court recognized, as the uncontradicted evidence indicated, that the taxpayer had a claim for reimbursement for this loss pending, it did not make a finding as to whether that claim "existed" in the year of discovery, and there is presently in the record only evidence that the claim was pending in 1965. Further, although the court stated that any recovery on the claim would have to be obtained through diplomatic proceedings and that as of the writing of that opinion the taxpayer "has been able to recover nothing although the United States Department of State has been assisting him in his efforts," 331 F.Supp. at 543, it did not determine nor could it have given the record, whether the claim, if pending in the year of discovery, had then "a reasonable prospect of recovery" or in what year the likelihood of recovery could be "ascertained with reasonable certainty". Lastly, though the court found that the cost of construction was $90,000, it made no determination as to the fair market value immediately before the theft, or as to the adjusted basis, or whether the former was less than the latter. The taxpayer on appeal asserts that the hotel was a unique item, not bought or sold in any market, that it therefore had no market value and consequently the cost measured its value to the taxpayer. We note, without accepting the theory,[10] that this is a matter for proof, as to which the taxpayer, of course, bears the burden. If the record is to be reopened, the taxpayer must bear the burden of proof, and the court must make findings, as to all of these

10. We doubt whether one can fairly say that an item has no "fair market value" simply because it is not a frequently or regularly traded commodity. While there is no existing market for or even frequent sale of ocean liners, we note that the Queen Elizabeth I was found to have some value when placed on the auctioneer's block. Indeed, even if there were no buyer for a floating hotel as such, the beds, chairs, dressers, and other objects which constituted the hotel obviously had some market value. Even if we were to assume that in some cases there is no "fair market value" for an item or its subdivided parts, the relevant figure would then be not the cost but the adjusted basis, which normally requires deductions from cost for depreciation. See 26 U.S.C. §§ 1011, 1016.

requisite factors. If the record is not reopened, the deduction for theft loss in 1962 must be disallowed, the taxpayer having completely failed to carry his burden as to several necessary elements of the deduction.[11]

## V. Fraud

The government sought to impose a fraud penalty on taxpayer for underpayment of taxes in 1959 and 1961. We have found it difficult to follow much of the government's brief on the factual matters involved in this aspect of the controversy, and thousands of pages of raw appendix also proved of little help. We take it, however, that as to 1959 the fraud penalty is alleged on appeal to be due as the result of a deficiency from failure to report as income certain constructive dividends from the Escambron Development Company and profits from the operation of two steamships. The district court, having found the Escambron dividends to be income, and apparently not having concerned itself with the two ships, looked only to the dividends issue and found that there was no fraud as to that item. As to 1961, the fraud penalty is alleged on appeal to be due as the result of a deficiency from a failure to report as income the $1,552,000 payment on the Boca Chica contract, interest derived from New

York bank accounts, profits from the operation of two steamships, and from the improper deduction of expenses relating to the Yuna contract. The district court, having rejected the government's assessments of deficiency on all claims but that relating to the bank account interest and again apparently not having concerned itself with the two ships, looked solely to the bank account interest and found no fraud.[12]

 When the government seeks to impose a fraud penalty pursuant to 26 U.S.C. § 6653(b), it has the burden to prove by clear and convincing evidence that some portion of the understated tax liability was a product of fraud. *Worcester, supra,* 370 F.2d at 717. "An essential condition to imposition of the fraud penalty is that there shall be a tax liability; therefore, the Commissioner will not be sustained in his assertion of the penalty where he fails to show that an omitted item is income", 10 Mertens, *supra,* § 55.10 at 52 (1972), or that unallowable deductions were taken. *Id.* at 88. In the instant case, since the district court had determined that, as to the omitted items in 1959, only the Escambron dividends were income, and that, as to the omitted items in 1961, only the bank account interest was income, it did not consider the alleged fraud surrounding other omissions or

---

11. The last issue, other than fraud, properly raised on appeal is the credence to be given the taxpayer's entire testimony. Obviously credibility is for the factfinder, not a reviewing court. Mendez v. Mendez, 176 F.2d 849 (1st Cir. 1949).

12. In its appeal brief the government relies, *inter alia,* on (1) its agent's discovery of a failure to report income from the ships Rio Haina and Puerto Trujillo in 1959 and 1961 and (2) the improper deduction of personal expenses which were claimed by taxpayer to come under Yuna contract expenses in 1961. We are uncertain as to the relevance of these facts here since we find no indication that the district court was wrong in saying that the fraud penalties were not bottomed on unreported gross income (or improper deductions) shown by that portion of taxpayer's records later taken by government agents

which revealed these acts, 331 F.Supp. 544; and as to expenses claimed on the Yuna contract, it appears that in its opening statement in 1966 the government disclaimed the presence of any fraud. We are also unsure whether the liability for self-employment taxes in 1959 and 1961 and the alleged 57.5% profit on the Azua and customs house contracts are relied upon as a basis for fraud. As to the former, there was no mention in the government's opening argument in 1966, and while there was such mention as to the latter, it is not addressed in the government's appeal brief. Lastly, we do not know whether the alleged 57.5% profit on the Yuna contract is relied upon, on appeal, to show fraud. It is obvious that upon remand it is imperative that the government make it clear as to which items fraud is, and can properly be, claimed.

commissions. As we have stated, many of these items, including the Azua, customs house, and Yuna contracts may again be the subject of further district court proceedings upon remand. Thus the tax years 1959 and 1961 will not be closed until the alleged deficiencies relating to every item relevant to each year are resolved. Should the government prevail on any of the claims to be further adjudicated and should there be ultimate tax liability for the year, the district court must, of course, consider the question of fraud as to those claims. "If any part of the deficiency was due to fraud the 50% penalty applies to the entire deficiency, not just the part produced by the fraud." *Worcester, supra,* 370 F.2d at 717 n. 4. Thus, at this juncture, we consider it unnecessary to review the district court's decision on the issue of fraud.

We deem it advisable, however, to comment specifically on the 1961 Boca Chica payment. We have found that, as a matter of law, that payment should have been included as gross income. If, after the year 1961 is closed, there occurs a deficiency due in part to this omission, the court should consider the issue of fraud as to Boca Chica *solely* on the record heretofore established regarding that payment. It was clear to all that, as to fraud, the government properly had the burden of proof and the parties must be deemed to have planned their cases accordingly.[13]

## VI. Summary of Disposition

On remand the court shall first determine whether the taxpayer reasonably relied on what we now say was an erroneous view of the burden of proof. As to this initial issue, the taxpayer has the burden. As we have said, the court may

determine this from the record, together with such briefs as were submitted. If the court deems it either necessary or helpful, it may hear the parties. If the court finds that the taxpayer relied—and was reasonable in relying—on the principle that the government bore the burden of proof, it shall allow the record to be supplemented by both parties.

In any event the record may be supplemented by available primary evidence bearing on the Yuna contract and the depreciation deductions, which, if not done, leaves taxpayer as to all but the dredge and ship depreciation issues with no admissible evidence so that the government must prevail. There is no need for reconsideration of the status of the $1,552,000 Boca Chica payment in 1961; we have already determined that this amount is to be included in gross income for that year. If the record is not to be supplemented, we rule that taxpayer has not, as a matter of law, carried his burden as to the Azua and customs house items or the theft loss deduction. If and when a deficiency has been determined for one or both of the tax years, the court shall then, placing the burden on the government, determine whether fraud on the part of the taxpayer has been proven.

In the interests of expediting final decision and of conserving judicial time, the court may, if it sees fit, appoint a special master to receive evidence and report the same together with recommended findings. The parties are encouraged to enter into stipulations which would expedite the resolution of this litigation without prejudice to either side.

Judgment vacated; case remanded to the district court for further proceedings consistent with this opinion.

---

13. We leave to the district court, for example, the government's claim that taxpayer did not explain his omission of the Boca Chica payment, which the United States suggests establishes fraud under the rule in Woodham v. Commissioner, 256 F.2d 201 (5th Cir. 1958), which we think is applicable here.

Similarly, as to fraud involved in Boca Chica and the other claims, should they prove pertinent, we are confident that the trial court will fully hear all arguments with respect to the relevancy of the fact that taxpayer's accountant, working from information supplied by taxpayer, prepared the return. *See e. g.,* Bender v. C.I.R., 256 F.2d 771 (7th Cir. 1958); 10 Mertens, *supra,* § 55.10 at 64.